880 A.2d 1171 (2005)
380 N.J. Super. 80
STATE of New Jersey, Plaintiff-Respondent,
v.
Gary FLETCHER, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 10, 2005.
Decided August 31, 2005.
*1172 Scott A. Krasny, West Trenton, argued the cause for appellant (Furlong and Krasny, attorneys; Mr. Krasny, on the brief).
Dorothy Hersh, Assistant Prosecutor, argued the cause for respondent (Joseph L. Bocchini, Jr., Mercer County Prosecutor, attorney; Ms. Hersh, of counsel and on the brief).
Before Judges SKILLMAN, GRALL and CHAMBERS.
The opinion of the court was delivered by
GRALL, J.A.D.
Defendant Gary Fletcher appeals from a final judgment of conviction and sentence. The grand jurors for Mercer County returned an indictment charging defendant and co-defendants Corey Jones and Arthur Simms as accomplices in eighteen counts alleging crimes committed when four men entered a residence on Lakeside Boulevard in Hamilton Township. The fourth participant, C.K., was charged as a juvenile. The charges against defendant were tried to a jury. C.K. and Simms plead guilty and testified on behalf of the State at defendant's trial. The State was unable to locate Jones. Defendant did not testify at trial, but statements he made to a detective investigating the crimes were admitted into evidence.
The case requires us to consider whether defendant's self-incriminating statements were voluntary or induced by an officer's promise to allow him to speak "off-the-record." Defendant made the self-incriminating statements after he came to police headquarters upon an officer's promise that he could make an "off-the-record" statement. At the station, a second officer presented defendant with a form that included the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and a waiver of the rights the warnings are designed to protect. The officers did not retract the promise or explain the conflict between defendant's waiver and an "off-the-record" statement. Relying on State v. Pillar, 359 N.J.Super. 249, 272-73, 820 A.2d 1 (App.Div.), certif. denied, 177 N.J. 572, 832 A.2d 322 (2003), we conclude that defendant's statements were induced by the promise and not freely and voluntarily given.
[At the court's direction, its recitation of the procedural history has been abbreviated.]
The jury convicted defendant of burglary while armed with a deadly weapon, a crime of the second degree, contrary to N.J.S.A. 2C:18-2a-b(2) (count one); three counts of robbery while armed with a deadly weapon, a crime of the first degree, contrary to N.J.S.A. 2C:15-1a-b (counts two, three and four); three counts of aggravated assault by pointing a firearm under circumstances manifesting extreme indifference to human life, a crime of the fourth degree, contrary to N.J.S.A. 2C:12-1b(4) (counts five, six and seven); simple assault, contrary to N.J.S.A. 2C:12-1a(1) (as a lesser offense included in aggravated assault, contrary to N.J.S.A. 2C:12-1b(1) (count eight)); three counts of terroristic threats in the third degree, contrary to N.J.S.A. 2C:12-3b (counts twelve, thirteen and fourteen); possession of a firearm for an unlawful purpose in the second degree, contrary to N.J.S.A. 2C:39-4a *1173 (count fifteen). The judge sentenced defendant to a term of imprisonment for an aggregate of eleven years, eighty-five percent of the term must be served without possibility of parole and the term is to be followed by a five-year term of parole supervision, N.J.S.A. 2C:43-7.2.
On May 4, 2002, Simms, Jones, C.K. and defendant entered Daniel Zapico's house on Lakeside Boulevard through the unlocked front door. Robert King and Adriene Bush were visiting Zapico.
Zapico, King and Bush gave similar but not wholly consistent accounts of the events. According to Zapico, Simms had a shotgun, told him to sit down and asked for money. When Zapico said he did not have any money, Simms swung the shotgun at his face. Zapico turned to avoid the blow and was struck in the back of the head. Next, Simms directed Zapico to call Montervino and tell him to come to the house. He warned Zapico that if he let Montervino know that defendants were there, "they would kill everyone." Simms took between $10 and $60 and drugs that were on the table. As Jones left the living room to look around the house, he handed his gun to defendant. Jones took cigarettes and about $400 from a back bedroom. When he returned, defendant handed him his gun. Zapico described defendant as the "least vocal" of the men and staying "pretty stationary" in the living room during the entire incident. Zapico recognized defendant from prior contacts with him.
According to King, the men ordered everyone to get on the floor, started looking around the house and were switching guns back and forth. He claimed that Jones put the gun to Zapico's head and took the "stuff" from the table. He did not see defendant take anything. He described defendant and Jones as friends.
Bush said she really could not see and was not sure what was taken. She did not see if defendant was holding a gun, but she remembers him asking for Montervino.
Danielle King arrived while the defendants were in the home. She saw defendant and two other men; one of them had a gun. The defendants left the house when Danielle King arrived.
Simms testified on behalf of the State, and he told the jurors that Jones came up with the plan to rob Montervino. Defendant was there when Jones told Simms about the plan, and they were all together when they picked up the guns. Defendant did not have a gun but could see that Simms had one. Simms went through the door first; defendant was "second or third" behind him.
C.K. also testified on behalf of the State. He said that Jones told him about his plans for Montervino and told them to pick up their guns when they got to Lakeside Boulevard. Defendant was right there when Jones gave the command. When they got to the house, defendant said the guns would go first. Simms went in first with the shotgun; C.K. had his gun in his sweatpants; and defendant came in last.
Defendant did not testify. Detective Braconi of the Hamilton Township Police Department led the investigation. One evening shortly after the crimes, Braconi had received a phone call from Detective Kalinowski, who works for the same police department. Kalinowski told him that defendant was coming in to make a statement. Defendant's girlfriend drove him to headquarters. Braconi took notes on the statements defendant made, but defendant refused to make a formal statement. According to Braconi, defendant told him that he went to the house to get money and that two of the men he was with took out guns after they were inside. Defendant told the detective that he never held *1174 one of the guns and did not know that the others had them.
Defendant raises four issues on appeal. He argues:
I. [DEFENDANT'S] CONVICTIONS ON COUNTS I-VII AND COUNT XV MUST BE REVERSED BECAUSE THE JURY CHARGE WAS IN ERROR.
II. THE DEFENDANT'S CONVICTIONS ON COUNTS I-VII AND XV MUST BE REVERSED SINCE ELEMENTS OF THOSE CRIMES WERE NOT PROVEN.
III. THE COURT ERRED IN ADMITTING DEFENDANT'S STATEMENT.
IV. THE COURT'S FAILURE TO SET ASIDE THE VERDICT ON DEFENDANT'S MOTION OR IN THE ALTERNATIVE TO GRANT A NEW TRIAL WAS IN ERROR.
We reject the claims raised in point II as lacking sufficient merit to warrant discussion in a written decision. R. 2:11-3(e)(2). We conclude that the evidence discussed above is adequate to defeat a motion for judgment of acquittal and support the convictions. A reasonable jury could find defendant's guilt beyond a reasonable doubt after considering all of the State's evidence and giving the State the benefit of all favorable evidence and inferences. See Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L. Ed.2d 560, 573 (1979); State v. Reyes, 50 N.J. 454, 458-59, 236 A.2d 385 (1967). For that reason, any inconsistency in the verdicts is immaterial. State v. Banko, 182 N.J. 44, 861 A.2d 110 (2004). Because we find that error in the jury instruction on accomplice liability requires reversal of defendant's convictions, we do not consider the trial court's ruling on defendant's motion for a new trial. We also conclude that defendant's statements were not made freely and voluntarily and may not be admitted into evidence at defendant's second trial.
[At the court's direction, the discussion of the jury instruction on accomplice liability has been omitted from this published decision.]

II.
Because the matter is remanded for a new trial, it is necessary to consider defendant's objections to the admission of his self-incriminating statements. The question about defendant's statements arose during trial. After the first day of testimony, Detective Kalinowski disclosed that he had convinced defendant to talk to Detective Braconi on the promise that defendant's statements would not be used against him.
The relevant facts are as follows. The night after the first day of trial, Detective Kalinowski reached both the prosecutor and defense attorney by telephone and told them about conversations he had with defendant and Detective Braconi on the night that defendant gave Braconi a statement about the Lakeside Boulevard incident. Before trial commenced the following day, defendant's attorney told the judge about the call, and the prosecutor reported his similar conversation with Kalinowski. Defendant's attorney (not appellate counsel) explained why the issue had not arisen before:
Judge, maybe I can explain this without violating my attorney-client privilege. Information that I had before trial was consistent, to some extent, with the information I received from Kalinowski, However, my opinion was that it did not rise to the level of a meritorious challenge to the statement on grounds of *1175 voluntariness. My opinion was that there was frequently and commonly an exchange between law enforcement and suspects at this stage, maybe you cooperate, we can help you, and there can be some benefit here, which I typically get, and I sort of saw this more in that category.
In light of these disclosures, the trial court granted defendant's application to take Kalinowski's testimony outside the presence of the jury and in accordance with N.J.R.E. 104.
Kalinowski testified that defendant's brother Michael brought defendant to Kalinowski's home on an evening after the burglary and robbery. The visit was unannounced. Michael had played baseball on a team coached by the detective years earlier. Michael kept in touch with Kalinowski. He visited Kalinowski at his home and even helped him do work around the house. Defendant too had played on a team Kalinowski coached, but Kalinowski had not seen him for years. He knew that defendant had been in some trouble in the past. Kalinowski also knew the brothers' father.
Michael told the detective that he thought his brother was in some kind of trouble and that he and his brother wanted to know if Kalinowski had heard that defendant was wanted or that there was a warrant for his arrest. The source of defendant's concern was not disclosed immediately. Eventually, there was a vague reference to Lakeside, and Kalinowski, who had heard about the burglary and robbery, asked defendant if he was talking about the Lakeside Boulevard incident. Defendant acknowledged that he was but said nothing else, and Kalinowski did not yet understand that defendant was directly involved.
Kalinowski placed a phone call to Braconi, who was investigating the incident, and Braconi told him that defendant's name had come up in his investigation. At that point, Kalinowski understood the serious nature of defendant's trouble.
As Kalinowski put it, from that point on he "was trying to wear two hats"  a friend of the family and a police officer. Kalinowski called defendant's father, who told him to treat the matter as he would if defendant were his son. Kalinowski urged the father to hire an attorney for defendant, and defendant's father said he would.
As a police officer, Kalinowski was concerned about locating the guns and finding out more about the others involved in the crimes. He urged defendant to help the police in these endeavors. Defendant was not "real cooperative." He did not say anything specific. Kalinowski told defendant that he was a suspect and would be arrested, if not that night, the following day. He explained that there would be a prison sentence because guns were involved. He emphasized law enforcement's need to find the guns and told defendant that his father had said he would hire a lawyer to defend him.
After two hours of discussion and persuasion, defendant agreed to have his girlfriend drive him to headquarters. Kalinowski then called Braconi to let him know that defendant was coming in. He followed defendant and his girlfriend to headquarters.
Kalinowski gave a synopsis of the discussion leading up to defendant's ultimate decision to talk to Braconi. He told defendant that anything he said would be "off-the-record." By "off-the-record," Kalinowski meant that no matter what defendant said, it would not be used against him. Kalinowski reported that he told defendant that the police just needed information. He promised, "If you come in and help us off-the-record, it's a feather in your cap, it *1176 will help you. It is good for you to cooperate, not just for yourself, but to get these other people and guns, period." He repeated that what defendant said would be "off-the-record."
Kalinowski explained that at the time he believed that there was enough evidence in the case to make anything defendant said unnecessary for prosecution. He also reported that his department had allowed defendants to make "off-the-record" statements under similar circumstances in the past.
When Kalinowski got to headquarters he told Braconi that defendant was willing to talk to him but only if it was strictly "off-the-record." Braconi listened. He did not say he disagreed with Kalinowski's condition, and he did not say he agreed. Believing that Braconi "understood where [he] was [] with this," Kalinowski went with Braconi to the interview room where defendant was waiting.
After brief introductions, Braconi gave defendant a written form which included Miranda warnings and a waiver of the rights explained by the warnings. Defendant read it, signed it, and, according to Braconi, said he understood it. Both officers witnessed his signature. There was no discussion of Kalinowski's promise of an "off-the-record" conversation.
At that point, it "started to dawn" on Kalinowski that Braconi was not going along with his plan for an "off-the-record" statement. He and Braconi left the interview room and had a discussion that was sufficiently "heated" to get the attention of the Sergeant, who took both detectives into his office. Kalinowski told them that they should be treating defendant as if he had an attorney because defendant's father was retaining one. Defendant never asked to wait for the lawyer.
The defense, prosecution and trial court agreed that the question posed "was whether, under the totality of the circumstances, defendant's [incriminating] statements were freely and voluntarily given." State v. Knight, 183 N.J. 449, 461, 874 A.2d 546 (2005).[1] Even where effective Miranda warnings are given, the "state must prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne." Id. at 462, 874 A.2d 546. Factors considered in evaluating whether a defendant's statement was induced or voluntary under the totality of the circumstances include the following: the "suspect's age, education and intelligence, advice concerning constitutional rights [Miranda warnings], length of detention, [and] whether the questioning was repeated and prolonged...." Id. at 462-63, 874 A.2d 546 (quoting State v. Galloway, 133 N.J. 631, 654, 628 A.2d 735 (1993)). Promises made by law enforcement are also relevant: where a promise is likely to "strip[] defendant of his `capacity for self-determination'" and actually induce the incriminating statement, it is not voluntary. Pillar, supra, 359 N.J.Super. at 272-73, 820 A.2d 1.
The trial judge concluded that defendant's statements were voluntarily and freely given. He made the following findings. Defense counsel did not raise the *1177 issue until he received the call from Kalinowski, which meant that his client had not provided adequate information earlier. Defendant was a twenty-two year old high school graduate, apparently of "above average intelligence" who went to Kalinowski, with whom he and his brother had a prior relationship, "for help  guidance, assistance and aid." During the course of an "over two-hour, rambling, rolling discussion" Kalinowski "made the off-the-record comment ... once, perhaps twice, perhaps three times." Kalinowski made the comment about an "off-the-record" statement "not to induce an incriminating statement but rather to find out about the guns and the other participants resulting in a `pseudo contract.'" There was a "twenty-minute separation" between the conversation and defendant's arrival at the police station. Kalinowski told Braconi "that he promised [defendant] off-the-record comments." Braconi "neither agree[d] nor disagree[d]." He proceeded to conduct the interview. These findings are supported by the record, and we accept them. State v. Smith, 374 N.J.Super. 425, 430, 864 A.2d 1177 (App.Div.2005).
The judge's conclusion that Kalinowski's promise did not induce the statement is premised on findings that do not take significant evidence into account, and we cannot defer to that conclusion. Id. The judge found that the Miranda warnings and defendant's subsequent waiver of rights demonstrated a knowing abandonment of the promise  i.e., "something that present[ed defendant] with the fact that he [was] going to be asked questions ... and before [which] ... he must be advised on his rights." He reasoned that if defendant had been relying on the promise of making off-the-record statements, he would have made a comment or asked a question when "a brand new officer present[ed]" Miranda warnings.
Our difficulty with that conclusion in light of the evidence is that neither the circumstances nor the officer were new. Defendant knew that he was coming to headquarters to talk to a detective other than Kalinowski, and Kalinowski's presence in the interview room must have provided defendant with assurance that things were going as planned.
The trial court also based the conclusion that defendant understood that he was waiving his right against self-incrimination on defendant's "guileful[] and cagy[]" responses to Braconi's questions. Here, the court referred to defendant's failure to identify his co-defendants or the location of the guns and his refusal to make a formal statement after responding to Braconi's initial questions.
The evidence was otherwise. Braconi testified that defendant was cooperative. Testimony about defendant's reluctance to speak was given by Kalinowski when he described defendant's attitude before he made the decision to give an "off-the-record" statement. Moreover, defendant implicated himself in the burglary during the informal statement. Viewed in the context of that admission, defendant's failure to identify his co-defendants or the location of the guns (assuming he even knew where the guns were) does not suggest caginess based upon a belief that the statement would be used against him. The refusal to make a formal statement after Braconi's informal questioning is more consistent with defendant's holding of a belief that the informal conversation was "off-the-record," as promised, but a formal statement would become part of the record that could be used against him.
Finally, the judge concluded that defendant had an obligation to inquire when presented with a waiver of rights "if he believed that his comments were going to be off-the-record." However, we conclude *1178 that under Pillar, supra, Braconi had the obligation to explain the conflict between the promise and the waiver.
In Pillar, this court examined an incriminating statement made by a "defendant... in specific and immediate response to the officer's assurance that defendant could speak off-the-record." Pillar, supra, 359 N.J.Super. at 272, 820 A.2d 1. Despite the fact that assurance of an "off-the-record" conversation came after defendant was given Miranda warnings, the court concluded that the State failed to prove beyond a reasonable doubt that defendant's subsequent statements were made freely and voluntarily after a "voluntary" waiver of rights. Id. at 268, 820 A.2d 1. The court reasoned that defendant could reasonably believe that the promise of an "off-the-record conversation" "meant that the statement would not be used against him." Ibid. On that basis, the court concluded that such a promise "had the likelihood of stripping defendant of his `capacity for self-determination'" and actually induced the incriminating statement. Id. at 272-73, 820 A.2d 1. We explained, "[a] promise that statements made will not be used against the defendant purports to remove the specter of proving one's own guilt by making a statement. Such a promise is a truly powerful one, going to the heart of a declarant's reservations about giving a statement." Id. at 273, 820 A.2d 1. We relied upon Streetman v. Lynaugh, which held that a "promise that any statement will not be used against the accused" is so "attractive that [it renders] a resulting confession involuntary." Pillar, supra, 359 N.J.Super. at 273, 820 A.2d 1 (quoting Streetman v. Lynaugh, 812 F.2d 950, 957 (5th Cir.1987)).
In Pillar the court cautioned:
A police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other. An acquiescence to hear an "off-the-record" statement from a suspect, which the officer ought to know cannot be "off-the-record," totally undermines and eviscerates the Miranda warnings, at least with respect to a statement made, as here, in immediate and direct response to the misleading assurance. As the Pennsylvania Supreme Court said, "[m]isleading statements and promises by the police choke off the legal process at the very moment which Miranda was designed to protect."
[Id. at 268, 820 A.2d 1 (citations omitted).]
Although the order of the Miranda warnings and the promise of "off-the-record" statements was different in this case, the rationale of Pillar requires the same result. Braconi knew about the promise Kalinowski had made. Kalinowski, an experienced detective, believed that Braconi intended to honor the promise. Kalinowski attended the interview, which must have led defendant to believe that things were going as planned. Knowing all this, Braconi simply presented a written form that included Miranda warnings and a written waiver of the rights Miranda is designed to protect.
Braconi knew that he did not intend to honor Kalinowski's promise. However, "[w]hether a statement ... amounts to a promise must be viewed from the defendant's, not the [interrogator]'s perspective...." Id. at 272, 820 A.2d 1 (quoting State v. Watford, 261 N.J.Super. 151, 163, 618 A.2d 358 (App.Div.1992) (Havey, J.A.D., concurring)). Defendant could well have concluded that the waiver was subject, or even irrelevant, to the prior promise. Braconi did not highlight or clarify the conflict. Rather, he allowed the promise to stand without an explicit retraction and without an explanation of the inconsistency *1179 with defendant's waiver of rights. Id. at 268, 820 A.2d 1.
We cannot distinguish the efficacy of the Miranda warnings in this case from the inefficacy of the warnings given in Pillar. The Miranda warnings Braconi gave "directly contradicted" the "off-the-record" offer given by Kalinowski and with that contradiction came the obligation to explain that the waiver of the right to remain silent would effectively override the prior promise. The officer in Pillar had a duty to explain that a promise to permit the "off-the-record" statements does not override a waiver of the right against self-incrimination and so did Braconi. Ibid. Here, the officers together (Braconi knowingly and Kalinowski unwittingly) gave conflicting messages. In Pillar, the conflicting messages came from the "mouth" of one officer. Ibid. The impact is the same. A "[m]isleading statement and promise by the police choked off the legal process at the very moment which Miranda was designed to protect." Ibid.
Accepting the trial judge's findings that are supported by and not inconsistent with the record, Smith, supra, 374 N.J.Super. at 430, 864 A.2d 1177, we cannot conclude that the State established beyond a reasonable doubt that the statements were not induced by Kalinowski's compelling promise of an opportunity to speak without consequence other than a favorable outcome in his case. Pillar, supra, 359 N.J.Super. at 270, 273, 820 A.2d 1. Defendant's statements may not be admitted at the second trial.
Reversed and remanded for a new trial.
NOTES
[1] Because the issue was not addressed below, we do not consider whether ineffective Miranda warnings provide an independent basis for exclusion of the statement. We consider the Miranda warnings as one factor relevant to the question whether the defendant's waiver of his right against self-incrimination and right to counsel and his making of the statements were voluntary or induced by Kalinowski's promise. See id. at 462-63, 874 A.2d 546; State v. Patton, 362 N.J.Super. 16, 42, 826 A.2d 783 (App.Div.), certif. denied, 178 N.J. 35, 834 A.2d 408 (2003).