**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0411-16T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOHN R. QUACKENBUSH,
a/k/a JOHN A. QUACKENBUSH,

     Defendant-Appellant.

_____

> Argued February 14, 2019 – Decided July 29, 2019
>
> Before Judges Simonelli, O'Connor and Whipple.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 13-08-0676.
>
> James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; James K. Smith, Jr., of counsel and on the briefs).
>
> Milton Samuel Leibowitz, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Michael A. Monahan, Acting Union County Prosecutor, attorney; Milton Samuel Leibowitz, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant John R. Quackenbush was convicted of first-degree murder of his mother, N.J.S.A. 2C:11-3(a)(1) and (2); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); and third-degree theft by unlawful taking, N.J.S.A. 2C:20-3. The trial court imposed a forty-year term of imprisonment with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

On appeal, defendant raises the following contentions:

POINT I

> HAVING DETERMINED THAT A DETECTIVE'S [ASSURANCE] THAT DEFENDANT COULD "ABSOLUTELY" SPEAK OFF THE RECORD PREVENTED HIM FROM KNOWINGLY AND INTELLIGENTLY WAIVING HIS RIGHTS, THE JUDGE ALSO SHOULD HAVE SUPPRESSED A BRIEF ORAL STATEMENT MADE ONLY MINUTES AFTER THAT MISREPRESENTATION.
>
> A. The Defendant's Statements.
>
> B. The Judge's Findings.
>
> C. The Defendant's Oral Statement Was Not The Product Of A Knowing And Intelligent Waiver Of His Rights.

2

POINT II

THE DEFENDANT WAS DENIED A FAIR TRIAL
BY THE COURT'S REFUSAL TO PROPERLY
REDACT HIS TAPED STATEMENT TO EXCLUDE
THE DETECTIVES' REPEATED ASSERTIONS
THAT HE WAS LYING AND THAT HIS VERSION
OF THE EVENTS WAS "BULLSHIT."

A.    The Refusal To Fully Redact Defendant's
Statement.

B.    The Detectives' Opinion That Defendant Was
Lying Was Clearly Inadmissible, And Should
Have Been Redacted.

We reject these contentions and affirm.

I.

Defendant lived with his mother, Gail Vandewalle.  Vandewalle worked at an Ethan Allen furniture store, where she was known for rarely missing work, often arriving early and staying late.  On February 20, 2013, Vandewalle did not arrive at work as scheduled and did not call the store to advise she would be absent.  The store manager, Jacqueline Braithwaite West, called Vandewalle, but Vandewalle did not answer.  Later that day, defendant called the store and told West "[h]is mom is well, she's a wonderful person.  She's a strong person.  That's my mom.  I love her.  She's a great woman."  In addition to missing work, Vandewalle missed a dinner she had tentatively planned with Lisa Piedade.

A-0411-16T2

Piedade had called Vandewalle earlier in the day to confirm their plans, but Vandewalle did not answer her cellphone and did not return Piedade's call.

Vandewalle was not scheduled to work again until February 23, 2013, but she often went to the store on her days off. She did not go to the store on February 21 and 22, did not report to work on February 23, and did not call the store to advise she would be absent. At 10:39 a.m., on February 23, defendant called the store and told the receptionist that Vandewalle's cellphone was broken "and a neighbor was taking her to get a new one and then she was going to Bank of America." Defendant also told the receptionist that Vandewalle would arrive at work after leaving Bank of America, but Vandewalle never arrived.

By February 24, 2013, Vandewalle's co-workers had become anxious about her whereabouts. One of Vandewalle's co-workers and friend, Manish Mistry, sent an email to defendant's brother, Joseph Quackenbush (Joseph), expressing concern about Vandewalle. Joseph responded and told Mistry he had spoken to defendant, who told him their mother was "okay" and was getting a new cellphone. Mistry also called defendant, but defendant did not respond. Mistry then sent defendant a text message asking him to respond, adding, "your mom hasn't been to work in a couple of days. People are worried."

A-0411-16T2

That same day, West called defendant's other brother, James Quackenbush (James), and the Plainfield Police Department (PDP) to express her concern about Vandewalle. At approximately 1:25 p.m., Police Officer Andre Crawford was dispatched to Vandewalle's home to try to locate her. Crawford knocked on the door when he arrived, but no one answered. He then walked around the house and entered through the rear door. Upon entering the house, Crawford noticed that the living room was "really dark," there was garbage in the house, and the house smelled like garbage. Crawford did not look behind the couch and did not notice anything suspicious, so he closed the back door and left.

At 2:01 p.m., after defendant spoke to Joseph, defendant sent him a text message saying he was about to take his lunch break and would be calling Mistry. Defendant also sent James a text message asking James to call him, but he did not answer when James called. Later that afternoon, at 3:58, defendant called Joseph and told him he was going home to check on their mother.

At approximately 5:00 p.m., after speaking to West and attempting to call both defendant and Vandewalle without success, James called the PDP and asked them to check on his mother's house. Officer Jihad Carter arrived at the house at approximately 6:02 p.m. with two other officers, who announced their presence and entered through the rear door. Carter noticed that the house was

5

filled with trash, garbage and debris and there was an odor. He went into the living room, which he noted was "very dark," and looked behind the couch, where he found some pillows and blankets. Carter moved one of the blankets and saw a woman's high heel shoe under it. He tried to move the shoe, causing the whole pile to move. Carter then moved to the other side of the couch and began moving the pillows. Upon moving the pillows, he saw a body, which was later identified as Vandewalle.

At approximately 6:30 p.m., Detective Edward Suter arrived at the house to photograph the scene and look for evidence.[1] He found a pair of black boots in defendant's room, which appeared to have "very small suspected blood stains" on them. The boots were later tested by a forensic scientist for the Union County Prosecutor's Office (UCPO), who testified that two spots on the right boot tested positive for blood, while all the spots on the left boot tested negative. A DNA

---

[1] Suter testified about the photographs he took, noting that blood in Vandewalle's head wound was dried and coagulated; a throw rug in the living room covered a large saturation stain of blood on an area rug, which had soaked through onto the wooden floor; and there was a "suspected blood trail" from the saturation stain to the area behind the couch where Vandewalle's body was found. There also was blood spatter on the base of the stairway and bannister and in the second floor bathroom, but there was no blood on the steps leading upstairs or in the basement, kitchen or dining room.

analysis confirmed the blood spots on the right boot matched Vandewalle's DNA.

Later that evening, the police went to a motel where defendant was staying with his girlfriend.[2] Although defendant was a person of interest in his mother's murder, the police arrested him for an outstanding warrant on a motor vehicle offense. The police found Vandewalle's cellphone and car keys in the motel room. In addition, defendant had used his mother's bankcard to make purchases in the days prior to his arrest.

At the police station, defendant was taken to the Detective Bureau and placed in Interview Room One, where he was left alone for approximately thirty-five to forty minutes. Defendant was then placed in Interview Room Two for a videotaped interrogation with Detective Thomas Robertson from the PDP and Detective Johnny Ho from the UCPO. Defendant received and waived his Miranda[3] rights. During the interrogation, the detectives asked defendant questions about his mother and advised defendant that they had already spoken to his brothers, Vandewalle's friends and co-workers, and defendant's girlfriend,

---

[2] During the time Vandewalle was missing, defendant made it appear to his girlfriend that his mother was alive.

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

and knew defendant was lying to them and his version of events was "bullshit." Robertson also advised defendant, "This is your only opportunity, okay. . . . This is the only time you're gonna get to tell your side of the story."

Defendant denied murdering his mother and said he did not want to talk any further without an attorney. The detectives stopped the interrogation and, as they got up to exit the room, defendant asked if he could talk to them off the record. Robertson replied, "Yeah, absolutely. Absolutely. But you're only going to have one opportunity to speak to us." The detectives then exited the interview room and placed defendant back into Interview Room One. They spoke to Assistant Prosecutor Scott Peterson and Sergeant Harvey Barnwell of the UCPO for several minutes outside Interview Room One. Barnwell told Robertson they could not have an off the record discussion with defendant. Robertson then asked if they could take defendant downstairs to the booking area to be processed.

Robertson reentered Interview Room One and escorted defendant out to take him downstairs to the booking area. Robertson and defendant did not speak to each other as they walked to the stairwell. When they reached the stairwell, defendant asked Robertson if he could speak to him, but Robertson replied that defendant "had that chance." Defendant's face turned "beet red," he covered his

8

face, began to cry and said "I did it" (the "I did it" statement). Robertson returned defendant to Interview Room One and discussed what happened with Peterson and Barnwell. Defendant was ultimately charged with his mother's murder.

Sometime after defendant's arrest, James, Piedade and Anna Harris went to Vandewalle's house to begin cleaning it out. While going through a closet near the living room, Piedade found a dumbbell, which appeared to have blood and hair on it, and noticed "a little puddle of blood" on the shelf next to the dumbbell. The weights on one end of the dumbbell had been removed and the handle was wrapped in black electrical or duct tape. James, Piedade and Harris did not touch the dumbbell and immediately called the UCPO, which sent a Crime Scene officer to photograph and recover the item. The dumbbell was found to have blood on it that matched Vandewalle's DNA.

Dr. Beverly Leffers, a forensic pathologist from the Union County Medical Examiner's Office, performed an autopsy on Vandewalle. Leffers testified that Vandewalle had between six and eight separate lacerations on the back of her head, a fractured skull with displacement of some fragments of the bone inwards, and some areas of hemorrhage within the membranes that surround the brain. Leffers opined that Vandewalle's injuries were consistent

9

with a number of blows to the back of her head, and the cause of death was blunt impact injuries to the head. She testified that the dumbbell found in Vandewalle's home is a heavy blunt object that could have been used to make the injuries Vandewalle sustained.

## II.

Defendant moved to suppress the "I did it" statement. The motion judge found the statement admissible because when defendant made it, the custodial interrogation had ended and defendant voluntarily reinitiated the conversation. The judge explained:

> They are walking. They're gone. They have left. Now, the defendant is going to be booked, and processed, and fingerprinted. Everything that takes place in a [b]ooking [a]rea, whether or not [defendant] knew what was going to happen at [b]ooking doesn't matter. He re-initiated the conversation. Robertson really says, you know what? You had your chance. As if to say, you know what? It's too late. Not that he used those words.
>
> And that's why I find . . . that [defendant] is, basically, blurting out, I did it, is admissible.

On appeal, defendant argues that although he reinitiated the conversation, the judge was also required to determine whether the "I did it" statement was the product of a knowing and intelligent waiver of defendant's <u>Miranda</u> rights. Defendant further argues the "I did it" statement was not made knowingly or

A-0411-16T2

intelligently because the detectives misled him to believe he could help himself by giving a statement and could speak "off the record with impunity."

Our review of a trial court's decision on a motion to suppress is limited. State v. Robinson, 200 N.J. 1, 15 (2009). As our Supreme Court has held:

> Appellate review of a motion judge's factual findings in a suppression hearing is highly deferential. We are obliged to uphold the motion judge's factual findings so long as sufficient credible evidence in the record supports those findings. Those factual findings are entitled to deference because the motion judge, unlike an appellate court, has the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy."
>
> [State v. Gonzales, 227 N.J. 77, 101 (2016) (citations omitted) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).]

We will "reverse only when the trial court's determination is 'so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Gamble, 218 N.J. 412, 425 (2014) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). However, we owe no deference to the trial court's legal conclusions or interpretations of the legal consequences flowing from established facts, and review questions of law de novo. State v. Watts, 223 N.J. 503, 516 (2015). Applying the above standards, we discern no reason to reverse.

It is elementary that a confession obtained during a custodial interrogation may not be admissible unless law enforcement first informed the defendant of his or her constitutional rights. State v. Hreha, 217 N.J. 368, 382 (2014). Once a defendant has been advised of his Miranda rights, he may waive those rights and confess; however, "that waiver must be 'voluntary, knowing, and intelligent.'" Ibid. (quoting Miranda, 384 U.S. at 444). If a defendant invokes his constitutional rights, the request "must be 'scrupulously honored.'" State v. Chew, 150 N.J. 30, 61 (1997) (quoting Michigan v. Mosley, 423 U.S. 96, 103 (1975)).

Once the defendant invokes his rights, the interrogation must cease and "[o]nly if the suspect [then] makes clear that he is not invoking his Miranda rights should substantive questioning be resumed." State v. Bohuk, 269 N.J. Super. 581, 592-93 (App. Div. 1994) (second alteration in original) (quoting State v. Wright, 97 N.J. 113, 120 n.4 (1984)). An "interrogation can resume only if the police administer a fresh set of Miranda warnings." State v. Harvey, 151 N.J. 117, 221 (1997). "That rule, however, does not apply if the defendant initiates a dialogue about the crime." Id. at 222. If the defendant initiates further conversation "after invoking his right to remain silent, the resumption of police questioning will not constitute a failure to scrupulously honor that right." State

12

v. Mallon, 288 N.J. Super. 139, 147 (App. Div. 1996). However, the State nevertheless "bears a 'heavy burden' of demonstrating that the waiver was knowing, intelligent, and voluntary." Chew, 150 N.J. at 61 (quoting State v. Hartley, 103 N.J. 252, 260 (1986)).

Although the State bears the burden of establishing that a defendant's waiver of his constitutional rights was knowing, intelligent and voluntary, "Miranda's protection extends only to acts of police officers 'reasonably calculated to elicit an incriminating response.'" Bohuk, 269 N.J. Super. at 594 (quoting State v. Lozada, 257 N.J. Super. 260, 268 (App. Div. 1992)). "To fall afoul of that rule, the defendant's statement must have been the product of police questioning or its functional equivalent." Ibid. Moreover, "the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where [he] [is] in custody [and] is subjected to interrogation." Ibid. (alterations in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 300 (1980)). Thus, in order to determine whether the judge in this case was required to consider whether the "I did it" statement was a knowing, intelligent, and voluntary waiver of the defendant's rights, we must first determine whether defendant's statement was the product of an interrogation.

"[T]he term 'interrogation' under <u>Miranda</u> refers to express questioning and any words or actions by the police that they 'should know are reasonably likely to elicit an incriminating response from the suspect.'" <u>Ibid.</u> (quoting <u>Rhode Island</u>, 446 U.S. at 301). "As conceptualized in <u>Miranda</u>, interrogation 'must reflect a measure of compulsion above and beyond that inherent in custody itself.'" <u>Ibid.</u> (quoting <u>Rhode Island</u>, 446 U.S. at 300). Thus, a "statement that is voluntarily blurted out by an accused in custody where the police have not subjected him to an interrogative technique" is deemed voluntary and is admissible without <u>Miranda</u> warnings. <u>State v. Ward</u>, 240 N.J. Super. 412, 419 (App. Div. 1990).

Here, the judge found the "I did it" statement admissible because it occurred after the interrogation had ended and defendant reinitiated the conversation. Thus, the judge found the statement was "a voluntary re-initiation blurt out" and was therefore admissible. This determination was reasonable, as illustrated in <u>State v. Beckler</u>, 366 N.J. Super. 16 (App. Div. 2004), and demonstrated by the facts leading up the statement.

In <u>Beckler</u>, the police arrested the defendant and transported him to the police station, where he was advised of and waived his <u>Miranda</u> rights. 366 N.J. Super. at 22. During the interrogation, the officers stopped the questioning and

14

one of them took the defendant to another part of the police station to process the arrest. Id. at 23. According to the officer, "as they walked along, defendant 'just started talking' spontaneously to him" and made several incriminating statements. Ibid. We found the statements made while the defendant was being transported to the booking area admissible because "there was substantial credible evidence establishing that the post-cessation statements, although made while defendant was in custody, were unsolicited, spontaneous, and not made in response to 'questioning or its functional equivalent.'" Id. at 25 (quoting Ward, 240 N.J. Super. at 418). Thus, we rejected the defendant's claim that the statements were not voluntarily, knowingly, and intelligently made, on the basis that the statements were not made in the context of an interrogation and therefore did not violate Miranda. Id. at 26.

Here, defendant had initially waived his Miranda rights, but subsequently invoked them. The detectives stopped the interrogation, placed defendant in a different interview room and, after a several minutes, Robertson returned to the room and began escorting defendant to the booking area for processing. During the transport, without any prompting by Robertson's words or actions, defendant reinitiated the conversation by asking Robertson if he could speak with him, to which Robertson replied that defendant "had that chance," thereby indicating

Robertson would not engage in further discussion with defendant. Defendant's face then turned "beet red," and he covered his face, began to cry, and blurted out "I did it." Thus, as in <u>Beckler</u>, the "I did it" statement was "unsolicited, spontaneous, and not made in response to 'questioning or its functional equivalent.'" <u>Id.</u> at 25 (quoting <u>Ward</u>, 240 N.J. Super. at 418). "Voluntary statements—those not elicited through interrogation—made by a suspect while in custody are admissible at trial." <u>Bohuk</u>, 269 N.J. Super. at 594. Because the "I did it" statement was not elicited through interrogation, the <u>Miranda</u> safeguards did not apply and the judge was not required to determine whether the statement was the result of a knowing, intelligent, and voluntary waiver of those rights.[4] <u>See ibid.</u> ("the special procedural safeguards outlined in <u>Miranda</u>" are only required when a suspect is in custody <u>and</u> is subjected to interrogation).

Although the "I did it" statement was not made during an interrogation and therefore is not subject to <u>Miranda</u> protections, the admissibility of the statement should nevertheless "be evaluated under a voluntariness standard

---

[4] Although defendant cites to a number of cases that address the requirement that a waiver of <u>Miranda</u> rights be "knowing, intelligent, and voluntary," such an inquiry arises only where the defendant was subject to interrogation and those rights have been implicated. <u>See</u> <u>State v. Fuller</u>, 118 N.J. 75, 87 (1990). Here, since the "I did it" statement was not made during an interrogation, such an inquiry is unnecessary.

A-0411-16T2

judged by the totality of the circumstances." See State v. Pillar, 359 N.J. Super. 249, 267 (App. Div. 2003). In determining the voluntariness of a statement, courts look to the totality of the surrounding circumstances and consider various relevant factors, including "the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved." State v. Galloway, 133 N.J. 631, 654 (1993).

Defendant argues the "I did it" statement was not knowing or voluntary because the detectives misled him into believing he could help himself by giving a statement. In support of this argument, defendant relies on State ex rel. A.S., 203 N.J. 131 (2010) and State v. Puryear, 441 N.J. Super. 280 (App. Div. 2015). However, both of these cases are distinguishable from this case. In A.S., our Supreme Court found that a detective's statement to the defendant advising that answering his questions would benefit rendered her resulting statement inadmissible because the detective's representation contradicted the Miranda warning "that anything she said in the interview could be used against her in a court of law." 203 N.J. at 151.

Similarly, in Puryear, the interrogating officer told defendant "[t]he only thing you can possibly do here is help yourself out. You cannot get yourself in

any more trouble than you're already in.  You can only help yourself out here." 441 N.J. Super. at 288. We found the defendant's ensuing statement inadmissible because the detective's representation had neutralized the Miranda warning and the defendant therefore did not knowingly, intelligently, and voluntarily waive his Miranda rights.  Id. at 298-99.

Both A.S. and Puryear held the defendants' statements inadmissible because the interrogating officers had contradicted the Miranda warnings and misled the defendants into believing their statements would help them and would not be used against them.  Ibid.; A.S., 203 N.J. at 151.  Defendant alleges the same principle applies here because during his videotaped interrogation, Robertson told defendant, "this is the only time you will have the opportunity to help yourself and talk to me."  However, our review of the videotaped interrogation confirms the detectives did not, at any time, indicate that defendant could help himself if he provided them with a statement.[5]  Rather, Robertson merely told defendant, "[t]his is the only time you're gonna get to tell your side of the story" and "this is the opportunity that we're providing you right now to

---

[5] The language defendant relies on and emphasizes in his brief was a statement Robertson made on cross-examination during the hearing on defendant's motion to suppress and did not reflect what Robertson actually said during the videotaped interrogation.

tell us your side of the story." These statements are not analogous to those made by the detectives in A.S. and Puryear, and they did not contradict defendant's Miranda warnings.

Defendant also argues the "I did it" statement was not knowing or voluntary because Robertson misled him by telling him he could speak off the record. The State concedes this was improper, but counters that Robertson's statement had no bearing on the "I did it" statement because the statement was made in the hallway after defendant knew the interrogation was over.

In support of his argument, defendant relies on Pillar and State v. Fletcher, 380 N.J. Super. 80 (App. Div. 2005). In Pillar, the defendant asked to speak to the interrogating officers "off-the-record" after being advised of and asserting his Miranda rights. 359 N.J. Super. at 262. The detectives agreed to listen to an off the record statement, and the defendant immediately admitted to the crime charged. Ibid. We found the defendant's statement was inadmissible, explaining that "[a]n acquiescence to hear an 'off-the-record' statement from a suspect, which the officer ought to know cannot be 'off-the-record,' totally undermines and eviscerates the Miranda warnings, at least with respect to a statement made . . . in immediate and direct response to the misleading assurance." Id. at 268. We therefore held the detective's agreement to speak off the record rendered the

resulting statement inadmissible because "such a misrepresentation directly contradicts and . . . neutralizes the entire purpose of the Miranda warnings[,]" and "may . . . render the statement involuntary." Id. at 265.

However, we also noted that "a misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession." Id. at 269 (emphasis added) (quoting State v. Cooper, 151 N.J. 326, 355 (1997)). Thus, although the defendant's statement was inadmissible because it was made "in direct and immediate response to [the detective's] knowingly incorrect representation that he could speak 'off-the-record[,]'" we also noted: "[w]e do not hold that an off-the-record assurance continues indefinitely to render a statement made in response thereto involuntary. A statement made at a substantially later point in time might well be found voluntary notwithstanding the earlier false assurance." Id. at 275.

In Fletcher, the defendant indicated to the interrogating officer that he was willing to talk to him, "but only if it was strictly 'off-the-record.'" 380 N.J. Super. at 88. The detective then promised the defendant that if he gave a statement "it will help you. It is good for you to cooperate," and "he repeated that what defendant said would be 'off-the-record.'" Ibid. We found the officer's offer to speak to defendant off the record "directly contradicted" the Miranda

warnings and induced the defendant's statement, rendering the statement inadmissible. Id. at 93.

In this case, it is undisputed that after defendant invoked his Miranda rights he asked the detectives if he could speak to them off the record and Robertson responded "Yeah, absolutely. Absolutely. But you're only going to have one opportunity to speak with us." Although this statement was improper, the record does not establish that Robertson's response induced defendant to make the "I did it" statement. Unlike in Pillar and Fletcher, the "I did it" statement did not immediately follow Robertson's statement that defendant could speak off the record.

Furthermore, there is no indication that the "I did it" statement was made "in specific and immediate response to the officer's assurance that defendant could speak off-the-record." See Pillar, 359 N.J. Super. at 272. On the contrary, the judge found that although Robertson's statement was improper, "[defendant], from the totality of the circumstances, had to know [the interrogation] was over." The judge explained:

> I understand Robertson said we can have an off-the-record discussion but there was not discussion at that point. There was no conversation in any of the interview rooms after Robertson mistakenly tells [defendant] they could have an off-the-record discussion, and it was a mistake for Robertson to say so

. . . but there's just no reasonable conclusion that [defendant] could have reached that that constituted an okay, acceptable off-the-record discussion when the two are not even sitting together.

Thus, the judge determined that defendant could not have reasonably believed the "I did it" statement would not be used against him and Robertson's statement did not strip defendant of his "capacity for self-determination." See id. at 272-73. As we stated in Pillar:

Although police misrepresentations are relevant in analyzing the totality of the circumstances surrounding a claim that a confession was involuntary, such "misrepresentations alone are usually insufficient to justify a determination of involuntariness or lack of knowledge." "Moreover, a misrepresentation by police does not render a confession . . . involuntary unless the misrepresentation actually induced the confession."

[Id. at 269 (citations omitted) (quoting State v. Cooper, 151 N.J. 326, 355 (1997)).]

There is no indication that Robertson's misrepresentation that defendant could speak with him off the record induced the "I did it" statement. At the time defendant made it, he was being transported to another area of the police department, was no longer in the interrogation room, and there had been no conversation between him and Robertson. Several minutes had passed between Robertson's statement and the "I did it" statement and, when asked if he could speak with Robertson before he made the statement, Robertson told him "he had

22

his chance," indicating defendant could not speak to him further. For the foregoing reasons, we are satisfied the judge did not err in finding the "I did it" statement was voluntary and admissible.

Even if the judge erred, the error was harmless because the case was not contingent upon the "I did it" statement and there was overwhelming circumstantial evidence of defendant's guilt presented throughout the course of the trial. Testimony revealed that defendant had lied to his brothers, his girlfriend, and Vandewalle's co-workers and friends about Vandewalle's whereabouts during the week she was missing. Defendant's girlfriend testified that although she had been at Vandewalle's home every night from February 18, 2013 through February 24, 2013, she did not see Vandewalle and did not hear her moving around the house during that time period. Defendant's girlfriend found this unusual because she always heard Vandewalle as she moved about the house. She also testified she could hear Vandewalle's radio playing in her room at night and defendant would knock on Vandewalle's door and appear to speak to her; however, she could not hear Vandewalle's responses, which she often heard in the past when defendant would speak to his mother through her bedroom door.

Evidence was also presented at trial that throughout the week in question, defendant used his mother's bankcard to pay for various expenses and drove her car several times. Moreover, when defendant was arrested, he was found in possession of Vandewalle's cellphone and car keys. Finally, an analysis of a pair of defendant's boots revealed drops of Vandewalle's blood. This evidence, which was presented at trial, surely could have led a jury to convict defendant even without admission of the "I did it" statement. Thus, any error in failing to exclude the "I did it" statement was harmless and does not warrant reversal.

III.

Defendant argues he was denied a fair trial because of the judge's refusal to redact his videotaped interrogation to exclude the detectives' comments that defendant was lying and his answers were "bullshit." Defendant posits the judge should have redacted those statements because they would have been inadmissible if made by the detectives while testifying at trial and did not become admissible just because they were made in the course of an interrogation.

"[I]n reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." State v. Kuropchak, 221 N.J. 368, 385 (2015) (quoting Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008)).

Under that standard, "[c]onsiderable latitude is afforded a trial court in determining whether to admit evidence," and "an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'" Id. at 385-86 (alteration in original) (quoting State v. Feaster, 156 N.J. 1, 82 (1998); State v. Marrero, 148 N.J. 469, 484 (1997)). We discern no abuse of discretion here.

Interrogation techniques used by an officer "to dissipate [a suspect's] reluctance and persuade the person to talk are proper as long as the will of the suspect is not overborne." State v. Miller, 76 N.J. 392, 403 (1978); see also Galloway, 133 N.J. at 655 ("The fact that the police lie to a suspect does not, by itself, render a confession involuntary."). Thus, "New Jersey courts . . . have permitted the use of trickery in interrogations."[6] State v. Patton, 362 N.J. Super. 16, 31 (App. Div. 2003). However, the issue is not whether the detectives' interrogation techniques were proper, but whether those portions of the

---

[6] Defendant concedes the police are allowed to misrepresent facts and express their opinion that the suspect is not telling the truth in order to induce the suspect to incriminate himself during an interrogation.

A-0411-16T2

interrogation during which they accuse defendant of lying should have been redacted.

The judge redacted a number of statements made during the interrogation, including references to defendant being unemployed, being a financial burden on his mother, and not having a driver's license, as well as any references to the defendant's outstanding warrant. The judge also redacted portions of the interrogation where the detectives accused defendant of lying to his mother or stated that others told them he was "a liar." The judge did not redact the detectives' statements that accused defendant of lying, including when they responded to defendant by saying, "you're lying," "all the lies," and "it's such bullshit." With regard to the last comment, the judge explained:

> I'm going to leave it in because it's in context with the interrogation and that's what it is. It's not as if the jury is going to say okay, Detective Ho thought it was a lie so we will, too. It's the back and forth between the parties. I'm going to allow it in. "All the lies" is repeated on that same page by the detective to which [defendant] basically says no, I'm not lying – and . . . I think it's fair and reasonable to leave it in. It adds context to the interrogation, to the transcript and the interview[.]
>
> [(Emphasis added).]

As for the other comments, the judge reiterated "I think it puts the back and forth, the confrontation, the conversation, if you will, between the detective and [defendant] in context." The judge further noted:

> there's evidence in the case from which a jury could decide the defendant was lying to multiple people. . . . So that should stay in. It's part of the interrogation, the confrontation between the parties. And the jurors are going to be told – they've already been told. In fact, I gave the instructions about credibility in the preliminary instructions with the questionnaire. Then they had them again after they're sworn. They'll have them again. If I made anything clear, they're the judges of the facts.

Although the judge agreed the detectives would not be permitted to make these statements or accusations if they were testifying at trial, she disagreed that the same rule applied to statements in an interrogation, finding:

> The law says that detectives actually can lie to a defendant . . . . And we know being in this business for a while that detectives – when a defendant says hey, I didn't do it, they often say you're lying and words to that effect. I'm not saying that's an opinion and it's so different. Interrogation is so different from what a witness can say in front of the jury. I think, again, the jury charge makes that clear. Certainly if you want me to add anything to the jury charge, I'll certainly consider anything you have to suggest.

It is clear from the judge's findings and explanation that she based her determinations on an understanding that the detectives' comments were

A-0411-16T2

admissible as long as they provided context for the interrogation and were not overly prejudicial. This view has been adopted by a number of jurisdictions, which have noted that such comments are presented to describe the interrogation and allow the jury to view the defendants' answers within the appropriate context of the interrogation.

For example, in State v. Boggs, 185 P.3d 111, 121 (Ariz. 2008), the Supreme Court of Arizona found that a detective's repeated statements to the defendant accusing him of lying during an interrogation were admissible because the accusations "were part of an interrogation technique and were not made for the purpose of giving opinion testimony at trial." The court nevertheless noted that "if [the defendant] had requested a limiting instruction, one would have been appropriate[.]" Ibid.

A North Carolina appellate court took a similar approach by rejecting the defendant's claim that the trial court should have redacted portions of a transcript in which a detective accused defendant of lying and giving an account of events that was "bullshit." State v. Castaneda, 715 S.E.2d 290, 294 (N.C. Ct. App. 2011). The court found that because the detective's statements "were part of an interrogation technique . . . and were not made for the purpose of expressing an

opinion as to defendant's credibility or veracity at trial, the trial court properly admitted the evidence." Id. at 295.

These views have been echoed by a number of other courts, which found such statements admissible and distinguished comments made during an interrogation from testimony given at trial. See Butler v. State, 738 S.E.2d 74, 81 (Ga. 2013) (alteration in original) (quoting Roberts v. State, 723 S.E.2d 73, 75 (Ga. Ct. App. 2012)) (comments made by law enforcement during an interrogation "and designed to elicit a response from a suspect do not amount to opinion testimony, even when [testimony reflecting] the comments is admitted at trial")[7]; Allen v. Commonwealth, 286 S.W.3d 221, 226 (Ky. 2009) ("[A]lthough it is generally improper for one witness to accuse another witness of lying, it is not . . . inherently improper for a police officer questioning a suspect . . . about holes or potential falsehoods in that suspect's theory of events in an effort to get the suspect to tell the complete truth."); State v. O'Brien, 857 S.W.2d 212, 221 (Mo. 1993) (detective's testimony that accused defendant of lying during the interrogation was admissible because the officer "was not

---

[7] Although Georgia courts recognize that a witness may not give opinion testimony about the defendant's credibility at trial, they have found that an interrogating officer is not offering opinion testimony during the course of the interrogation. Dubose v. State, 755 S.E.2d 174, 183 (Ga. 2014).

telling the jury that, in his opinion, the defendant is a liar. Rather, the witness was describing the give-and-take of his interrogation"); Dubria v. Smith, 224 F.3d 995, 1001-02 (9th Cir. 2000) (detective's statements were admissible because they "were questions in a pre-trial interview that gave context to Dubria's answers"); State v. Demery, 30 P.3d 1278, 1284 (Wash. 2001) (officer's statement made during a taped interview "merely provided the necessary context that enabled the jury to assess the reasonableness of the defendant's responses").

Many jurisdictions have taken a contrary approach, finding that a jury should be prohibited from hearing such statements, even if the statements are made in light of an effective and permissible police interrogation tactic. See State v. Elnicki, 105 P.3d 1222, 1229 (Kan. 2005) (detective's comments that defendant was lying and was "bullshitting" him were prohibited "even if the statements are recommended and effective police interrogation tactics"); Wilkes v. State, 917 N.E.2d 675, 686 (Ind. 2009) (a statement made by a detective during an interrogation that implicitly or explicitly conveyed his opinion concerning the defendant's guilt should have been excluded); Commonwealth v. Kitchen, 730 A.2d 513, 521 (Pa. 1999) (an officer's statements to defendant accusing him of lying "were akin to a prosecutor offering his or her opinion of

30

the truth or falsity of the evidence presented by a criminal defendant, and such opinions are inadmissible at trial").

Although the treatment of this issue by other jurisdictions is mixed, it is clear that the differing views are rooted in a determination of whether an officer's statements made during an interrogation should be regarded as opinion testimony. Defendant argues the detectives' statements constituted opinions about the defendant's guilt, whereas the State argues the comments were offered for their effect on defendant and not for their truthfulness, and they were not made for the purpose of expressing an opinion as to defendant's credibility at trial.

Although there are no published New Jersey cases to guide our analysis, we addressed a similar issue in State v. Graham, No. A-1111-10 (App. Div. May 16, 2013).[8] In Graham, the defendant argued that the trial court erred in admitting portions of the defendant's interview in which the interrogating officers accused him of lying. Id. at 26. In evaluating the defendant's claim, we acknowledged that police officers may not give testimony suggesting that others

---

[8] Although an unpublished opinion does not constitute precedent or bind the court, the facts and analysis in this case shed light on the issues before us. See Trinity Cemetery Ass'n, Inc. v. Twp. of Wall, 170 N.J. 39, 48 (2001); R. 1:36-3.

have implicated the defendant in a crime and may not state their opinion regarding the veracity of defendant's statements or his guilt. Id. at 27. However, we noted that statements made by officers interrogating a defendant are admissible "for the limited purposes of providing context for the defendant's responses relevant to the voluntariness of defendant's statement." Id. at 28. Thus, we held:

> Where a defendant raises a valid objection based on inclusion of otherwise inadmissible evidence in the video recording of an interrogation, the court should consider whether redaction is necessary or a limiting instruction directing the jury on permissible and impermissible uses of the testimony will suffice to prevent misuse of the evidence.
>
> [Id. at 27.]

We applied these standards and found the detectives' statements were admissible, provided the judge gives the jury a proper limiting instruction, directing the jurors on how they may or may not use the evidence presented. Ibid. There, the judge had given a detailed limiting instruction regarding the use of interrogation tactics and instructing the jury that they should not use the statements made by the detectives in light of those tactics "for the truth of the matter asserted." Id. at 29.

In light of the similar views of other jurisdictions, and our own conclusions in Graham, we conclude the judge did not err in failing to redact the detectives' comments. As reflected above, the judge's view mirrored, to an extent, the view adopted by the courts of Arizona, North Carolina, Georgia, Kentucky, Missouri, and others, finding the detectives' comments during the interrogation were not akin to a detective's testimony at trial. Although the judge acknowledged the comments would not have been admissible if presented as trial testimony, the judge distinguished such testimony from statements during a videotaped interrogation, which detectives are permitted to make and which "add context to the interrogation." In light of the fact several other jurisdictions have adopted a similar analysis of the issue, we are satisfied the judge's findings did not constitute an abuse of discretion.

Further, at the conclusion of trial, the judge gave the jury extensive instructions regarding the function of the court and the role of the jury. The judge advised the jury it was the judge of the facts and it had the responsibility "to determine the credibility of the various witnesses as well as the weight to be attached to their testimony." The judge added and later re-emphasized throughout the jury charge, "You [the jury] and you alone are the sole and

exclusive judges of the evidence, of the credibility of the witnesses and the weight to be attached to the testimony of each witness."

The judge instructed the jury that, although it had heard a number of oral statements allegedly made by defendant, it was the jury's role to determine whether or not the statements were made and whether they were credible. As to the jury's determination of credibility, the judge noted "[i]n considering whether or not the statements are credible, you should take into consideration the circumstances and facts as to how the statements were made, as well as all other evidence in this case relating to this issue." As to the defendant's videotaped interrogation, the judge instructed the jury that:

> It's for you, the jury, to decide the credibility of the evidence presented. . . . It's your function to determine whether or not the statement was actually made by the defendant and, if made, whether the statement or any portion of it is credible. You may consider all of the circumstances surrounding the statement in making that determination with the following caution.

The judge also clarified that "the State's burden of proof never shifts to the defendant."

The judge made it exceedingly clear that the jury was responsible for determining the credibility of any witnesses and that the State bore the burden of proof. The potential prejudice to defendant resulting from the detectives'

comments during the interrogation was significantly reduced if not eliminated by the judge's instructions. Furthermore, there is nothing in the record that suggests the jury relied on the detectives' comments or that the redaction of same would have changed the outcome of the trial. It is important to note that the videotaped interrogation was played to the jury on the last day of testimony, after defendant's brothers and girlfriend, and Vandewalle's friends and co-workers, had already testified about the lies defendant told them.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0411-16T2