**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5678-17

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

GERRY THOMAS,

      Defendant-Appellant.

_____

Argued March 1, 2021 – Decided May 24, 2021

Before Judges Rothstadt and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 17-05-0491.

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Mark Niedziela, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Mark Niedziela, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

After the trial judge denied defendant Gerry Thomas's motion to suppress his second custodial statement to police, a jury found defendant guilty of two counts of first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); one count of second-degree arson, N.J.S.A. 2C:17-1(a)(1) and (a)(2); and, one count of first-degree attempted robbery, N.J.S.A. 2C:5-1(a)(3), N.J.S.A. 2C:15-1(a)(1). The convictions arose from defendant's alleged participation in a robbery that resulted in the murder of two victims and the destruction of their remains through the torching of the car in which they were killed. After his convictions, the trial judge sentenced defendant to an aggregate term of eighty years subject to a period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2.

Defendant appeals from his conviction and sentence and argues the following points:

> POINT I
>
> DEFENDANT'S SECOND STATEMENT WAS TAKEN IN VIOLATION OF HIS RIGHT AGAINST SELF-INCRIMINATION, WAS INVOLUNTARY, AND WAS UNRELIABLE. THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS HIS STATEMENT.

2

POINT II

THE MOTION FOR A JUDGMENT OF ACQUITTAL ON ATTEMPTED ROBBERY SHOULD HAVE BEEN GRANTED BECAUSE THE STATE FAILED TO PRESENT ANY EVIDENCE THAT DEFENDANT INTENDED HIS CO-DEFENDANT TO COMMIT A ROBBERY OR THAT THE CO-DEFENDANT ACTUALLY COMMITTED AN ATTEMPTED ROBBERY.

POINT III

THE JURY INSTRUCTIONS INCORRECTLY FAILED TO SPECIFY THAT THE JURY HAD TO UNANIMOUSLY AGREE ON THE VICTIM OF THE ATTEMPTED ROBBERY. THE ATTEMPTED ROBBERY AND FELONY MURDER CHARGES MUST BE REVERSED. (NOT RAISED BELOW).

POINT IV

THE FAILURE TO INSTRUCT THE JURY ON AN ELEMENT OF FELONY MURDER AND TO TAILOR THE FELONY MURDER INSTRUCTIONS TO THE UNUSUAL FACTS OF THIS CASE REQUIRES REVERSAL OF THE FELONY MURDER CONVICTIONS. (NOT RAISED BELOW).

POINT V

DEFENDANT'S CONVICTIONS MUST BE REVERSED BECAUSE THE JURY HAD UNRESTRICTED ACCESS TO THE COMPILATION OF SURVEILLANCE VIDEOS IN THE JURY ROOM. (NOT RAISED BELOW).

POINT VI

THE DEFENDANT'S AGGREGATE SENTENCE OF EIGHTY YEARS WITH AN 85% PAROLE DISQUALIFIER IS MANIFESTLY EXCESSIVE AND DISPARATE WITH THE CONCURRENT EIGHTEEN-YEAR SENTENCE IMPOSED ON THE CO-DEFENDANT.

POINT [VII][1]

[DEFENDANT'S] SIXTH AMENDMENT RIGHT UNDER THE UNITED STATES CONSTITUTION AND ARTICLE I PAR. 10 OF THE NEW JERSEY STATE CONSTITUTION WAS VIOLATED BECAUSE TRIAL COUNSEL RENDERED INEFFECTIVE [ASSISTANCE] OF COUNSEL FOR HIS DUAL REPRESENTATION SERVING AS THE VICTIM'S FAMILY [ATTORNEY] AS WELL AS THE DEFENDANT['S ATTORNEY]. (NOT RAISED BELOW).

We conclude that the trial judge erred by denying defendant's motion to suppress his second statement to the police because during their second interrogation of defendant they repeatedly implied that he could avoid being charged with the subject murders if he responded to their questions. For that reason, we reverse the motion's denial, vacate defendant's convictions, and remand for a new trial.

---

[1] For clarity, we renumbered this last point, which defendant raised in a pro se supplemental brief.

4                                                                      A-5678-17

I.

In response to defendant's motion, the trial judge held a <u>Miranda</u>[2] hearing over three days at which two of the Paterson Police Department detectives who took his statements, Richard Martinez and Steven Leishman, testified about the interviews. Detective Sabrina McKoy with the Passaic County Prosecutor's Office also testified as to a letter her office received from defendant while he was in jail awaiting trial. The facts developed at that hearing are summarized as follows.

The Paterson Police Department became interested in defendant's co-defendant, Clarence Williams, on March 10, 2017, after an individual reported that he had been the victim in an unrelated robbery. Police identified Williams as a suspect for that robbery, and sometime between March 10 and March 17, 2017, they charged Williams with robbery and weapons offenses and issued a warrant for his arrest.

On March 17, 2017, two bodies were discovered inside a burned parked car in Paterson. Phone records disclosed that Williams had exchanged multiple phone calls with one of the victims just prior to the time of the homicides. As a

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-5678-17

result, Williams became a suspect in the murders. Using information from the cell phone, law enforcement was able to locate Williams.

On March 20, 2017, police officers executed the warrant for Williams by forcibly entering his house. When they entered the home, Williams was in the living room and defendant was in a bedroom. Officers handcuffed both men and drove them to the detective bureau in separate police cars.

Upon arrival at the bureau, defendant and Williams were placed in separate interrogation rooms; Martinez and Detective Bermudez first interviewed defendant, and Sergeant Abdelmonin Hamdeh and Leishman interviewed Williams. After defendant was placed inside the interview room, its door was closed and defendant remained seated and unrestrained.

Martinez read defendant his Miranda rights and defendant verbally indicated he understood them. Defendant also signed the form acknowledging he understood his rights, and that he wanted to waive them by speaking to the police. Martinez believed defendant understood the situation and he observed that defendant was coherent, answered questions appropriately, and did not appear intoxicated.

Defendant was then read the waiver portion of the Miranda form and asked by Martinez "Do you want to talk about the incident?" Defendant responded by

6

asking "What incident" and was told by Martinez it involved "a boy['s] . . . dispute with somebody outside their house."

Later in the interrogation, Bermudez stated that the detectives had "something else [they] want[ed] to talk about, but you understand these rights, right? The second portion, too, that nobody's made threats or anything about any threats or used any force against you?" With that, the following exchange occurred:

> [DEFENDANT]: So, waive my right to mean what?
>
> DETECTIVE MARTINEZ: We've got to talk about something. Another incident that happened.
>
> [DEFENDANT]: All right.
>
> DETECTIVE MARTINEZ: Well, you want to talk? You want to talk? I mean, sign or (indiscernible).
>
> [DEFENDANT]: What did that— what did it mean, though?
>
> DETECTIVE MARTINEZ: That you're agreeing to talk and nobody has used force or pressure against you.
>
> [DEFENDANT]: Yeah.

A-5678-17

The detective began to question defendant and eventually addressed the subject incident. Defendant indicated that he did not know what the detective was talking about and denied being in the location that the detectives described.

Later in the interview, Hamdeh joined the session and told defendant that Williams implicated defendant in the crime, which Hamdeh described as two robberies. Martinez knew that information to be false, but they confronted him with that as part of their "tactics used during interrogations." Defendant continued to deny any involvement.

After the interrogation, defendant was permitted to leave the detective bureau and no charges were filed against him at that time. However, the officers retained defendant's cell phone.

In the meantime, Leishman interrogated Williams. After that interrogation, Leishman also reviewed surveillance videos that had been obtained during the homicide investigation and identified defendant as "a person of interest" from those videos. One surveillance video was from a Walgreens near the crime scene. The police were interested in that Walgreens because a witness found a receipt near the crime scene that showed lighter fluid had been purchased from that store. The video depicted a very tall man who Leishman believed was defendant based on his height. As Martinez explained, the

8

detectives could not identify the faces of the individuals, but the difference in their "physical stature" was significant.

Defendant returned to police headquarters later the same day to retrieve his cell phone. When he did, the detectives detained him and Leishman and Hamdeh conducted a second interview, which started at about 8:50 p.m. and lasted about two hours. During the interview, defendant was again not handcuffed and had not yet been charged with any offenses.

Defendant was read his <u>Miranda</u> rights a second time. He again signed the <u>Miranda</u> waiver, but did not verbally respond to the detective's oral request for confirmation that he knew his rights and wanted to speak without an attorney.

At the start of the second interrogation, the following exchange between the detectives[3] and defendant occurred:

> [SERGEANT HAMDEH]: My name is Sergeant Hamdeh and this is Detective Leishman, I don't know if you remember from earlier.
>
> [DETECTIVE LEISHMAN]: So you were here earlier and (unintelligible) <u>went through this whole formality</u> we're just going to do it one more time alright, so today is March 20th at 8:52 p.m. Before we ask you any questions you must understand your rights. You have the right to remain silent anything you say can be

---

[3] The transcripts provided do not reflect which detective is speaking at which time. The following is based on the transcripts provided, as supplemented by our review of the taped interrogation.

A-5678-17

used against you in a court of law. You have the right to talk to a lawyer for advice before we ask you any questions. Also you have the right to have a lawyer with you during any questioning. If you cannot pay for the services of a lawyer, a lawyer will be appointed to represent you without cost before any interrogation. If you decide to answer questions now without a lawyer present you will still have the right to stop answering questions at any time you also have the right to stop answering at any time until you talk to a lawyer, you understand that?

[DEFENDANT]: (Unintelligible) . . . all over again.

[DETECTIVE LEISHMAN]: Listen we just have to go through this before we talk to you.

[SERGEANT HAMDEH]: <u>You're not in trouble. You walked out earlier right?</u>

[(Emphasis added).]

As Hamdeh was telling defendant that he was not in trouble, Leishman slid the <u>Miranda</u> rights waiver form over to defendant. Defendant then signed the waiver form. After defendant signed the form, Leishman asked him to confirm that he knew what it meant:

[DETECTIVE LEISHMAN]: You know what this says right? You signed it already, but the waiver of rights. I have read or been read my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I'm doing. No promises or threats have been made to me and nobody

10

has used pressure or force of any kind against me. Right, you agree you already signed it so you [sic] gonna talk to us again?

Defendant did not respond, as he just sat with his chin resting on his hands on the table. Hamdeh then immediately asked defendant, "What's your last name brother," and defendant responded "Thomas."

During the ensuing interrogation, the detectives told defendant that they had video of him entering a Walgreens at 1:30 a.m. wearing a black trench coat similar to a coat they recovered from Williams' house where defendant had been staying. Defendant acknowledged that he had always shopped at Walgreens and had been there that week but initially denied being there at that time or owning a trench coat.

They also told defendant that his height and "distinctive walk" made it clear to them that it was defendant in the video, and that a video of the crime scene showed him walking up to the car and lighting it on fire. In response to defendant denying any involvement, the following exchange occurred, during which Hamdeh raised his voice:

> [SERGEANT HAMDEH]: I GOT VIDEO MAN, I GOT VIDEO, you're not telling me the God's honest truth.

> [DEFENDANT]: Sir I wasn't . . .

11

[SERGEANT HAMDEH]: You're not telling me the God's honest truth, you're lying to me.

[DEFENDANT]: Sir I don't even own a black trench coat sir.

[SERGEANT HAMDEH]: I got, I got video. I got video.

. . . .

[DETECTIVE LEISHMAN]: He doesn't understand that I pretty much got that video. We watched that video and if you were walking next to me people are gonna go "goddam that guy is tall."

During the following later exchange, for the first time, the detectives advised defendant that two people were killed during the incident:

[DETECTIVE LEISHMAN]: I got news for you, you're caught up in a lot of nonsense because there's a few of you. And you know what happen when a bunch of guys do something together, somebody talks. And they put it on another person. Listen, you can sit here and lie. I'm not going through that. . . . I got videos right here that says you're lying.

[DEFENDANT]: I'm not denying I was in Walgreens but I didn't have nothing to do with nothing. . . . I don't even know what happened.

[DETECTIVE LEISHMAN]: Two people got killed. . . . Why did we have to tell you that? You really think we don't know you were there?

[DEFENDANT]: I wasn't there sir.

A-5678-17

[DETECTIVE LEISHMAN]: You're there on the videos.

[DEFENDANT]: In Walgreens? Sir they got killed in Walgreens?

[DETECTIVE LEISHMAN]: Let's not play stupid here. We know they were in a car. It's been all over the news for the last three days. You're on video walking right up to that car. . . . The car where two people got killed in.

[DEFENDANT]: Nah.

[DETECTIVE LEISHMAN]: And lit it on fire.

[DEFENDANT]: Impossible.

The detectives also advised defendant that Williams implicated him, and told defendant he needed to "get out in front of this."

[DETECTIVE LEISHMAN]: I can honestly tell you this you gotta get out in front of this because this is big. [Williams] did a lot of talking today. We just left here at 8 o'clock and now we're back again cause you showed up. We were actually gonna come back and get you tomorrow cause we needed to talk to you. But since you showed up but . . .

[DEFENDANT]: Cause I know I didn't do anything wrong sir.

[DETECTIVE LEISHMAN]: That's not what [Williams] said.

[DEFENDANT]: Well he lying [sic] to ya. He probably want [sic] sir come on sir. If [Williams] did

13

A-5678-17

that, if he said I did something wrong, you guys wouldn't even released me earlier.

> [DETECTIVE LEISHMAN]: When [Williams] told us all the stuff that happened we went and looked at all the videos that we've been pulling from the past three four days and sure enough we're able to corroborate a lot of stuff he told us and then boom here's a guy towering over everybody walking, wearing the clothes that we recovered from your apartment.

During the interrogation, the detectives also made statements to defendant about the possibility of him being charged with the murders and robberies, even though they knew he played a "minimal role." While making these statements, they again told defendant he had to "get ahead" of the situation. Those statements included the following:

> [DETECTIVE LEISHMAN]: You're gonna end up wearing all these charges when you might of just had a minimal role in this whole thing.

> [DEFENDANT]: Minimal role in what though sir? I don't even know what's going on. I wouldn't even be here sir. I'm too smarter [sic] than that. I wouldn't even be here sir.

> [DETECTIVE LEISHMAN]: Why do you think you're sitting here talking to us about this? Do you think we just picked you out? All day we been [sic] here watching video after you left and we said holy shit he was just here.

> [SERGEANT HAMDEH]: Yeah we were kicking ourself [sic] in the ass because we let you go.

14

A short time later, as defendant continued to deny any involvement, the

detectives warned defendant again:

> [DETECTIVE LEISHMAN]:  <u>But this is your opportunity to get in front of it</u> because you may not have pulled the trigger but you can go to jail just as long as the guy who did.
>
> [SERGEANT HAMDEH]:  How about this, how about this, I know you didn't pull the trigger.  Listen, listen to me, I know you didn't pull the trigger. . . . Hear me out.  . . .  I know you didn't pull the trigger because I got video.  You understand that?  I know that.  I know you didn't do that.  But I know you were there.
>
> [DEFENDANT]:  Sir I wasn't there.
>
> [SERGEANT HAMDEH]:  Hear me out.  I know you were there.  I know you were there.
>
> [DEFENDANT]:  I need to see those videos cause I was never on no 14th Ave.
>
> [SERGEANT HAMDEH]:  <u>When you put all the pieces together . . . you're gonna be screwed if you don't fucking get ahead of this</u>.
>
> [(Emphasis added).]

Later, the detectives again warned defendant about getting "in front" of

the charges:

> [DETECTIVE LEISHMAN]:  The story you're gonna go with right now, how do you think that's gonna appear in court with a jury?

A-5678-17

[DEFENDANT]:  Let the jury decide.

[DETECTIVE LEISHMAN]:  If you do that buddy you're never gonna see the light of day, two bodies.

[DEFENDANT]:  I don't got nothing to do with no two bodies sir.

[DETECTIVE LEISHMAN]:  We're not saying you're the one that did it, but we know you were there with the people that did it [sic] we know you went there with the people that did it.  We know your phone is calling the guy that did it.

[SERGEANT HAMDEH]:  Unfortunately . . . you might as well been the person that did it.  <u>Okay if that's the case unless you get in front of this and help yourself, you might as well been the person that shot the bullet.  No, no, hear me out.  You might as well been the person who did it unless you get in front of this.  Cause if you don't get in front of this you're just as guilty.</u>  You understand?

[DEFENDANT]:  Can I just see the videos?

[SERGEANT HAMDEH]:  No, no listen you're just as guilty and believe me believe me phone records don't lie.  No, no, hear me out phone records don't lie.

[(Emphasis added).]

Hamdeh also told him that he was implicated in the crimes because of his presence on the videos, but that he could "minimize [his] damage."  Leishman also told defendant that "[t]he problem here is you're on video.  You're with

16

them . . . whether or not you pulled the trigger doesn't mean anything because everybody is going to get charged with that. Whoever wants to cooperate?" and "we're gonna walk outta this room and you're gonna get hit with both of them." (Emphasis added).

Although, as noted, defendant initially denied being with Williams that night and said that he did not know what happened because he was not there, after the detectives reiterated they had video of him at the scene and that Williams implicated him, he eventually stated that "I wasn't there when nobody shot nobody, nobody, burned nobody. I wasn't present sir." When the detectives responded by stating "You were present at the Walgreens when the igniter fluid was bought to go back there and torch the car," defendant admitted that he had been in a minivan driven by Williams and there were one or two other men in the vehicle, but he was only there before and after the homicides took place.

Defendant ultimately admitted that he had been at the Walgreens but denied that he purchased lighter fluid or had anything to do with setting a fire or otherwise being involved with a crime. When the detectives asked him if he knew the names of the people who were there, defendant said he only knew Williams, and repeated that he did not know who pulled the trigger because he was not there when anyone was shot.

17

Significantly, the detectives again told defendant if he "wanted to help [himself] out" he would need to "start from the beginning," and tell them the names of people that were present in the van. They also told him that "[saying] I don't know, I don't know, that's not helping you." Defendant only reiterated that when he got in the van there were three other people and that one was Williams, but he did not know the others. However, he eventually told the detectives that one of the other men in the van was someone known as "Masterborn."

Defendant also told the detectives he kept calling Williams that night because he wanted to buy marijuana from him. He claimed that Williams told him where he was, and defendant realized he was nearby, which was when and why defendant got into the van.

Defendant claimed he later asked Williams to let him out of the van because defendant was concerned that Williams and the others were planning on "bust[ing] a custy,"[4] and he did not want to be involved in light of his own prior criminal history. According to defendant, he was eventually dropped off and then went to the Walgreens. He then explained that outside of Walgreens, he

_____

[4] At trial, Leishman explained that this term meant "they were going to rob a customer."

gave a dollar to a boy whom the detective stated bought the lighter fluid. Defendant then again maintained he was not involved in the commission of any crime. When defendant repeatedly stated that none of the vehicle's occupants told him anything about a shooting, the detective responded by telling defendant he was not "helping [him]self."

The detectives also told defendant that another video showed him wiping prints off the white car, and defendant denied doing so.[5] When the detectives again asked for the identities of the other men with Williams that night, defendant expressed that they were not known to him. The detective told defendant that by not identifying the others, defendant was "not giving [them] the information [they] need for [defendant] to help [him]self out," and that "[t]here's only one thing right now that's gonna help you with anything and that's telling us who the other guys were."

Defendant responded that even if he knew their names, the detectives were not letting him go because they suspected he wiped the prints from the car. In response, Hamdeh told him to think about going to trial and how things would

---

[5] This video did not clearly depict the faces of the individuals shown in the footage so the detectives again relied on defendant's height.

 A-5678-17

"play out" if he cooperated, rather than what would happen if he continued denying his involvement.

After stepping out of the room, the detectives returned and Hamdeh told defendant that the interview was "about over, unless you want to give us anything else that could help you." Defendant asked what he could do in order to walk out of there and Hamdeh told him that was "not happening," but "if you want to help yourself in the future you could tell us something." Defendant then asked, "Can you please just give me a chance to talk, please sir," and whether there was "nothing I could say, there's nothing I could do to get me outta here right now?" The detective responded, "Nah, not gonna lie to you cause I haven't lied to you these past two hours I haven't lied to you."

In the trial judge's ensuing written decision finding the statement admissible, he found that defendant's "'freedom of action' was sufficiently deprived to show that he was in custody," even though he was "not under formal arrest or in physical restraints." He also found that although Hamdeh[6] "certainly did not seek to highlight the significance of the second round of questioning," the detective's characterization of executing the <u>Miranda</u> rights as a "'formality'

---

[6] Both defendant and the trial judge attributed the "formality" comment to Hamdeh, although from the video it appears that Leishman said it. For reasons explained below, it is of no moment who made the comment.

was not tantamount to a deprivation of a knowing conveyance of Miranda warnings."  Citing defendant's prior record of eight arrests, "one indictable conviction, three disorderly persons and one municipal ordinance conviction," the judge concluded that defendant was "familiar with the justice system."  The judge acknowledged that, even though it is not known whether defendant was advised of his rights during the prior arrests, "his rights were undoubtedly discussed during prior court proceedings associated with those arrests."

The judge also found that the questioning of defendant in this matter was "not prolonged in view of underlying events."  Additionally, although the police "raised their voices at times during the second interrogation," the judge "did not observe anything approaching physical or mental exhaustion on [defendant's] part or any other behavior to suggest that his will was overborne."  He found that the police "raised their voices out of frustration out of apparent contradiction or omission by" defendant, and that "the heated discussion that followed was of an emotionally charged nature indicative of the seriousness of the matter under discussion."  The judge did not find that defendant appeared intimidated and he still "insisted on conveying his own version of events" while "in the face of heightened emotions."  Consequently, the judge found beyond a reasonable doubt that defendant knowingly, intelligently, and voluntarily

21

waived his <u>Miranda</u> rights prior to making the statement.  The judge also found that defendant's letter to the prosecutor was admissible.

## II.

### A.

Our review of a trial judge's findings at an evidentiary hearing or trial is deferential.  <u>See</u> <u>State v. Tillery</u>, 238 N.J. 293, 314 (2019); <u>State v. Hubbard</u>, 222 N.J. 249, 262-65 (2015).  Nevertheless, "[w]hen faced with a [challenge to a] trial [judge]'s admission of police-obtained statements, [we] engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights."  <u>State v. Hreha</u>, 217 N.J. 368, 381-82 (2014) (quoting <u>State v. Pickles</u>, 46 N.J. 542, 577 (1966)).  "Subject to that caveat, [we] generally will defer to a trial court's factual findings concerning the voluntariness of a confession that are based on sufficient credible evidence in the record."  <u>State v. L.H.</u>, 239 N.J. 22, 47 (2019).  This deference extends to a judge's determinations based not only on live testimony but also when based on the review of video or documentary evidence because of the judge's "expertise in fulfilling the role of factfinder."  <u>State v. S.S.</u>, 229 N.J. 360, 364-65, 379-80 (2017).

22

We will not reject the trial judge's factual findings merely because we "disagree[] with the inferences drawn and the evidence accepted by the trial [judge] or because [we] would have reached a different conclusion." Id. at 374. Only if the judge's factual findings are "so clearly mistaken that the interests of justice demand intervention and correction," will we discard those factual findings. State v. Gamble, 218 N.J. 412, 425 (2014). When the judge's factual findings are "not supported by sufficient credible evidence in the record," the reviewing court's deference ends. S.S., 229 N.J. at 361. Then, the trial judge's interpretation of the law and "the consequences that flow from established facts are not entitled to any special deference." Gamble, 218 N.J. at 425.

B.

With these guiding principles in mind, we turn to defendant's contentions on appeal that he did not knowingly and voluntarily waive his rights because the detective "hastily recited the rights," presented them as a formality, and minimized the importance of the warnings by telling him he was not in trouble and pointing out that he had been able to leave the police station earlier that day. He additionally contends that the detectives' conduct "induced" him into waiving his rights and that they deprived him of important information "relating to the nature of the allegations against him," since the detectives had watched the

23

surveillance videos and believed defendant was involved in a crime but told him he was not in trouble.

Defendant further argues that he did not voluntarily give his statement because the police coerced him. He asserts that the detectives repeatedly yelled at him that they had video proof he was involved in the murders, that they misrepresented the videos because it was impossible to identify "anyone from the surveillance videos," and that the detectives lied that Williams told the detectives that defendant was involved in the murders. Based on those representations, defendant claims that the detectives "contradicted the Miranda warnings" by telling him that he had to confess "his full involvement in these offenses" in order to avoid facing murder charges.

We conclude that although, as the trial judge found, the detectives properly administered Miranda warnings, which defendant understood and acknowledged,[7] the combination of the detectives' repetitive misleading

_____

[7] While, as defendant argues, it is true officers "should scrupulously avoid making comments that minimize the significance of the suspect's signature on that card or form," Tillery, 238 N.J. at 319, the detective's first comment that the Miranda warnings were just "a formality," can be overlooked as an offhand remark that simply preceded the warnings defendant said he understood and waived. It is the rest of the statements the officers made that we view as impermissible. See State v. O.D.A.-C., No. A-2932-18, (App. Div. Feb. 8, 2021) (slip op. at 13) (explaining that the detective's characterization of Miranda

statements telling defendant that talking to them would, in contravention of the Miranda warnings, help defendant, the detectives improperly induced defendant to give incriminating information in contravention of his Fifth Amendment rights. As such, we conclude that his statement should not have been admitted as evidence.

"The right against self-incrimination . . . guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, [is] now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381-82. The importance of that right cannot be overstated. As Justice Albin stated in L.H., "[n]o piece of evidence may have greater sway over a jury than a defendant's confession. For that reason, it is of critical importance that law enforcement officers use interrogation techniques that will elicit confessions by lawful means." 239 N.J. at 27.

A defendant may waive his Fifth Amendment rights so long as the waiver is made knowingly, intelligently, and voluntarily. State v. Sims, 466 N.J. Super. 346, 363 (App. Div. 2021) (citing Miranda, 384 U.S. at 444), certif. granted, __

---

warnings as a formality was not by itself a problem but all of his statements had to be viewed in context); State v. Cooper, 151 N.J. 326, 355 (1997) ("[M]isrepresentations alone are usually insufficient to justify a determination of involuntariness or lack of knowledge.").

N.J. __ (2021)(slip op. at 1). Before a defendant's custodial statement may be admissible, the State must "'prove beyond a reasonable doubt that the suspect's waiver [of rights] was knowing, intelligent, and voluntary.'" Ibid. (alteration in original) (quoting State v. A.M., 237 N.J. 384, 397 (2019)).

When determining whether "the State has satisfied its burden," a court must consider the "totality of the circumstances," which includes "factors such as the defendant's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." Ibid. (quoting A.M., 237 N.J. at 397). Additionally, a court may consider the defendant's "previous encounters with law enforcement," State v. Knight, 183 N.J. 449, 463 (2005) (citing State v. Presha, 163 N.J. 304, 313 (2000)), and the "period of time between 'administration of the [Miranda] warnings and the volunteered statement.'" Ibid. (alteration in original) (quoting State v. Timmendequas, 151 N.J. 515, 614 (1999)). The evidence must establish that the statement was given voluntarily and "not . . . because the defendant's will was overborne." L.H., 239 N.J.at 42 (quoting Knight, 183 N.J. at 462).

Our Court has explained that "[t]o eliminate questions about a suspect's understanding, the entire Miranda form should be read aloud to a suspect being

interrogated, or the suspect should be asked to read the entire form aloud," and to the extent that is not done, "the suspect should be asked about his or her literacy and educational background." A.M., 237 N.J. at 400. In determining whether a waiver has occurred, "[t]he criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances." State v. Kremens, 52 N.J. 303, 311 (1968). The focus of a Miranda analysis should be on whether the defendant had a clear understanding and comprehension of his or her Miranda rights based on the totality of the circumstances. State v. Puryear, 441 N.J. Super. 280, 297 (App. Div. 2015) (citing State v. Nyhammer, 197 N.J. 383, 402 (2009)).

"Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Tillery, 238 N.J. at 316 (quoting Berghuis v. Thompkins, 560 U.S. 370, 384 (2010)). However, a defendant signing a waiver of his rights, which were read to him prior to being questioned, cannot be accepted as evidence of a waiver where the interrogating officer "minimize[s] the significance of the suspect's signature on that card or form." Id. at 319 (concluding that a defendant's signature to a waiver form that only

acknowledged his rights were read to him did not establish a waiver of his rights).

For example,"[i]n [State ex rel. A.S.], the interrogating officer violated a juvenile defendant's rights by telling her that answering questions 'would actually benefit her'—an assertion at direct odds with the Miranda warning 'that anything she said in the interview could be used against her in a court of law.'" L.H., 239 N.J. at 44 (quoting State ex rel. A.S., 203 N.J. 131, 151 (2010)). Similarly, in Puryear, the interrogating officer told defendant "[t]he only thing you can possibly do here is help yourself out.  You cannot get yourself in any more trouble than you're already in.  You can only help yourself out here."  441 N.J. Super. at 288.  We found the defendant's ensuing statement inadmissible because the detective's representation had neutralized the Miranda warning and the defendant therefore did not knowingly, intelligently, and voluntarily waive his Miranda rights.  Id. at 298-99.

As we observed in that case, "[a] police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other." Id. at 296-97 (first quoting State v. Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003); then citing United States v. Ramirez, 991 F. Supp. 2d 1258, 1269-70

(S.D. Fla. 2014) (telling a defendant if he or she did not answer questions "it would be worse" contradicted the Miranda safeguards)).

The courts in A.S. and Puryear both held the defendants' statements inadmissible because the interrogating officers had contradicted the Miranda warnings by misleading the defendants into believing their statements would help them and would not be used against them. Id. at 298-99; A.S., 203 N.J. at 151 (holding that the detective telling the defendant that answering his questions would show that the defendant was a "good person" contradicted the Miranda warnings). However, in Pillar, where a defendant admitted to a crime based on the interrogating officer's assurance that their conversation was off the record, we observed that "a misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession." 359 N.J. Super. at 269 (quoting State v. Cooper, 151 N.J. 326, 355 (1997)).

"A court may conclude that a defendant's confession was involuntary if interrogating officers extended a promise so enticing as to induce that confession." L.H., 239 N.J. at 45 (quoting Hreha, 217 N.J. at 383). "[W]here a promise is likely to 'strip[] defendant of his "capacity for self-determination"'

and actually induce the incriminating statement, it is not voluntary." <u>Ibid.</u> (quoting <u>State v. Fletcher</u>, 380 N.J. Super. 80, 89 (App. Div. 2005)).

As Justice Albin also explained in <u>L.H.</u>, while certain lies told by interrogating officers are tolerated, inducements to speak to law enforcement that include express or implied assurances of leniency cannot be tolerated. Specifically, he stated the following:

> Because a suspect will have a "natural reluctance" to furnish details implicating himself in a crime, an interrogating officer may attempt to dissipate this reluctance and persuade the suspect to talk. . . . . One permissible way is by appealing to the suspect's sense of decency and urging him to tell the truth for his own sake. . . . Our jurisprudence even gives officers leeway to tell some lies during an interrogation. . . .
>
> Certain lies, however, may have the capacity to overbear a suspect's will and to render a confession involuntary. Thus, a police officer cannot directly or by implication tell a suspect that his statements will not be used against him because to do so is in clear contravention of the <u>Miranda</u> warnings. . . .
>
> Other impermissible lies are false promises of leniency that, under the totality of circumstances, have the capacity to overbear a suspect's will. . . . A free and voluntary confession is not one extracted by threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . .
>
> . . . .

Under the totality-of-the-circumstances test, a promise of leniency is one factor to be considered in determining voluntariness. . . . Courts have recognized that the danger posed by promises of leniency is that such promises in some cases may have the capacity to overbear a suspect's will and produce unreliable— even false—confessions. . . . Some courts also take into account an interrogator's "minimization" of the offense when questioning the suspect as one factor in determining the voluntariness of a confession.

[L.H., 239 N.J. at 43-46 (internal quotation marks, alterations, and citations omitted).]

Applying these controlling principles to defendant's contentions on appeal, we conclude that the trial judge erred by denying defendant's motion to suppress his second statement to police. The statement was obtained after the interrogating detectives repeatedly and persistently told defendant that the only way he could help himself was by admitting his role in the subject robberies and murders. These statements effectively "contradicted the Miranda warnings provided to [defendant]: that anything [he] said in the interview could be used against [him] in a court of law." A.S., 203 N.J. at 150.

Although defendant maintained that he had nothing to do with the crimes despite the officers' representations, because of the officers' assurances that he could help himself by talking to them, defendant placed himself with his codefendant in the vehicle, neighborhood, and store the police had connected to

31

the crimes. Under these circumstances, the statement should not have been admitted.

While the trial judge engaged in a detailed analysis of the circumstances, he overlooked the detectives' false promises to defendant. While on one hand, they told defendant he was not in trouble, on the other they falsely told defendant that he could help himself if he gave a statement, which directly negated the Miranda warnings and induced defendant to supply incriminating information. This information included verification that he was at Walgreens and in the van with Williams and others on the night in question. As we have explained, a detective cannot in one breath provide Miranda warnings to a suspect, including the vitally significant fact that anything the suspect says can and will be used against him in a court of law, and in the next, make repeated assurances that speaking with the police will ultimately help that suspect in the same court of law. Puryear, 441 N.J. Super. at 296-97.

The assurances from the detectives that defendant could help himself by talking presented an overwhelming enticement to supply incriminating information, with the hope, as defendant stated, he would be released. As such, the detectives' assurances "clearly had the likelihood of stripping defendant of his 'capacity for self-determination.'" Pillar, 359 N.J. Super. at 272-73 (quoting

Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)). These circumstances thereby require the conclusion that the State failed to establish defendant's statement was voluntary beyond a reasonable doubt. See id. at 273.

Because our determination that defendant's statement to police was inadmissible requires us to vacate his convictions and remand for a new trial, we need not address defendant's remaining contentions about the trial judge's instructions to the jury, his denial of the motion to acquit, defendant's allegation of ineffective assistance of counsel, or defendant's sentence.

The denial of defendant's suppression motion is reversed, his judgment of conviction is vacated, and the matter is remanded for a new trial.

Reversed and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION