# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1917-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LESTER A. GARCIA,

    Defendant-Appellant.

_____

Argued March 4, 2025 – Decided August 8, 2025

Before Judges Gooden Brown, Smith and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 19-12-2023.

Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Zachary G. Markarian, of counsel and on the briefs).

Thomas M. Caroccia, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Thomas M. Caroccia, of counsel and on the brief).

PER CURIAM

After his motion to suppress his statement to police was denied, defendant Lester A. Garcia entered a conditional negotiated guilty plea, see R. 3:9-3(f), to second-degree sexual assault, N.J.S.A. 2C:14-2(b), stemming from him sexually abusing his almost eight-year-old half-niece, J.G. Defendant was sentenced in accordance with the plea agreement to seven years in prison, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. He was also sentenced to parole supervision for life, N.J.S.A. 2C:43-6.4, and ordered to comply with the provisions of Megan's Law, N.J.S.A. 2C:7-1 to -23, and Nicole's Law, N.J.S.A. 2C:44-8.

Defendant, a Honduran national, was living in a house with several people, including J.G., J.G.'s sister, and J.G.'s mother and his half-sister, C.G.-M. On September 2, 2019, C.G.-M. reported to the Ship Bottom Police Department that defendant had sexually assaulted J.G. the day before. Two days later, she and J.G. gave statements to police. C.G.-M. said that she had left her two daughters at home with defendant and when she returned home from work, J.G. told her that she woke up to defendant inserting his fingers into her vagina and that it hurt. J.G. disclosed that on September 1, 2019, defendant digitally penetrated her vagina and touched her buttocks. She also stated that on a

previous occasion, he had asked her to undress when she was alone with him in the bedroom.

Upon learning that defendant had left New Jersey, on September 5, 2019, law enforcement obtained a communications data warrant (CDW), leading to defendant being located in Fairfax County, Virginia, the following day. With the assistance of Fairfax County police personnel, defendant provided a statement to police in Virginia in which he ultimately made incriminating admissions.

Defendant was subsequently charged in a three-count Ocean County indictment with first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); second-degree sexual assault, N.J.S.A. 2C:14-2(b); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1). He moved to suppress his statement to law enforcement, which was denied by the trial judge in an order and accompanying written opinion issued on June 20, 2022. His sexual assault guilty plea conviction and sentence were later memorialized in a February 8, 2023 judgment of conviction.

Defendant now appeals from the denial of his motion to suppress his statement, raising the following points for our consideration:

POINT I

[DEFENDANT'S] MIRANDA[1] WAIVER WAS INVALID BECAUSE POLICE CONSISTENTLY UNDERMINED THE WARNINGS BY URGING [DEFENDANT] TO ADMIT TO THE CRIMINAL ACTIVITY TO "HELP [HIM]SELF" AND INSISTING THAT, BECAUSE THEY HAD PROOF, HE WOULD "HAVE TO TALK."

    A.    [Defendant] Was in Custody After Being Located Using a [CDW], Taken to the Police Station, and Interrogated About Allegations He Had Committed Sexual Assault.

    B.    [Defendant's] Waiver Was Not Valid Because Officers Repeatedly Undermined the Miranda Warnings Throughout the Interrogation.

POINT II

THE STATE FAILED TO PROVE [DEFENDANT'S] STATEMENT WAS VOLUNTARY WHERE OFFICERS RELENTLESSLY URGED [DEFENDANT] TO ADMIT TO THE CRIMINAL ACTIVITY TO "HELP [HIM]SELF," MINIMIZED THE GRAVITY OF THE CHARGES AGAINST HIM, FALSELY CLAIMED DNA EVIDENCE ALREADY PROVED HIS GUILT, AND INSISTED HE WOULD "HAVE TO TALK" IN CONTRADICTION OF THE MIRANDA WARNINGS.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1917-22

A. Police Officers' Insistence That Admitting to Sexual Assault Would "Help" [Defendant] and That He Would "Have to" Talk To Police Was Highly Coercive.

B. Officers' Repeated Comments Minimizing the Conduct At Issue and Misrepresenting the Legal Punishment For Sexual Assault Were Psychologically Coercive.

C. Officers' Repetitive False Statements That [Defendant's] DNA Was Found Inside the Complaining Witness Further Overbore His Will and Impaired His Capacity for Self-Determination.

POINT III

THE PORTIONS OF [DEFENDANT'S] STATEMENT FOLLOWING HIS QUESTION REGARDING A LAWYER AND HIS WRITTEN NOTE SHOULD HAVE BEEN SUPPRESSED BECAUSE DETECTIVES DID NOT CLARIFY WHETHER HE WAS INVOKING HIS RIGHT TO COUNSEL.

Based on our review of the record and the governing legal principles, we affirm in part and reverse in part.

I.

We glean these facts from the Miranda hearing conducted on April 26 and 27, 2022, during which Ocean County Prosecutor's Office Detective Alexander Bromley, Fairfax County Police Department Patrolman Alfredo Cerna, and

Fairfax County Police Department Detective Daniel Romanoff testified for the State.

Bromley testified that on September 2, 2019, he was assigned to investigate the sexual assault allegation made by J.G. against defendant. According to Bromley, after J.G. and her mother reported the incident to Ship Bottom Police Department officers, as well as Division of Child Protection and Permanency caseworkers, J.G. was transported to the hospital and underwent a forensic medical examination. Forensic interviews of both J.G. and her mother were also conducted on September 4, 2019, with the assistance of Spanish-speaking personnel.

After the interviews, Bromley obtained authorization to conduct a consensual interception of a phone conversation between C.G.-M. and defendant to elicit incriminating evidence, but defendant did not answer C.G.-M.'s phone calls. Upon learning that defendant had left New Jersey, Bromley applied for a CDW to ascertain defendant's location in order to interview him. Once the warrant was approved, the cell phone provider gave an estimated location for defendant of Fairfax County, Virginia. Bromley then contacted Fairfax County Police Department and requested assistance in obtaining a voluntary statement

A-1917-22

from defendant. Bromley testified that "[t]here were no charges approved or even considered at [that] point."

At about 10:00 p.m. on September 6, 2019, Cerna, a bilingual officer,[2] was called by patrol units to La Hacienda, a restaurant located in Franconia District, to translate for someone who only spoke Spanish. According to Cerna, "there was no warrant in the system," and he was only tasked with translating for the individual, not to detain or make an arrest. Upon arrival, Cerna encountered defendant and confirmed that defendant was the person he was called to assist based on Bromley's request.

Cerna verified defendant's name and the fact that defendant had recently lived in New Jersey and "was in Virginia for work." Cerna then asked defendant "if he would be willing to go back" with him to the police station "and speak to a detective" about "some issue that he had in New Jersey." Defendant asked "how far the station was" and "how he would get there." After Cerna assured him that the station "was just a few minutes away" and that he "could give him a ride in [his] car," defendant agreed to go of his own volition. Cerna offered

---

[2] Cerna testified that he had undergone departmental testing to establish his proficiency in the Spanish language.

A-1917-22

"to take [defendant] home or bring him back" to La Hacienda "once he was done talking to the detective."

During the "five-minute drive" to the police station, defendant was seated in the back of Cerna's "unmarked" "patrol cruiser." He was not handcuffed or restrained in any way. The two "engage[d] in small talk" during the ride, which was captured on the motor vehicle recording from Cerna's car, admitted into evidence, and played at the hearing. Once they arrived at the police station at about 11:00 p.m., Cerna informed defendant that the detective was on his way. The surveillance video of Cerna and defendant entering the building was also admitted into evidence and played during the hearing. Cerna had defendant sit "inside the lobby" of the station and asked if he wanted something to drink. Defendant asked for "some warm water," which was provided. At that point, Cerna left defendant in the public lobby and went to another part of the building to wait to see whether he was needed to further assist with translation.[3]

Meanwhile, Romanoff, a detective in the Major Crimes Bureau, Child Abuse Squad, was on call and assigned to the case. Romanoff was provided with an "event log" summarizing the investigation and asked to "attempt to get

---

[3] Cerna described the police station as a municipal building that was open to the public and housed the County Executive and other government offices.

[defendant's] date of birth and other identifiers." Romanoff contacted Bromley for a case briefing and was advised about the allegation, including the fact that the medical examination had revealed that "there was a cut in [J.G.'s] vagina." Bromley told Romanoff that defendant had left New Jersey after the allegation was made and was located in Fairfax, Virginia. Bromley also informed Romanoff that "[t]here was no warrant in the system" for defendant and "no reason to detain him," so if defendant "want[ed] to leave at any point," he was free to do so.

Romanoff then responded to the Franconia District Station where he was advised that defendant had been transported. Upon arrival, Romanoff confirmed that defendant was waiting in the lobby. Because defendant spoke only Spanish, Romanoff requested Cerna's assistance for the interview. Once Cerna arrived, Romanoff approached defendant and asked if he was willing to speak with him. After defendant agreed, all three men proceeded through a door and walked about fifty feet through "a very short hallway" to a "room for privacy." As they passed through the door, Romanoff advised defendant that he was "free to go at any time" and that "[t]he doors [were] all unlocked." Romanoff also confirmed that "[defendant] was never handcuffed."

Once inside the room, Romanoff activated the recording system and began audio and video recording the interview at 11:53 p.m. Romanoff began the interview by letting defendant know he was "[there] to talk . . . about a very important case," but "before [they] start[ed] talking," Romanoff wanted him "to know that [he was] free to leave whenever [he] want[ed]."[4] Romanoff told defendant it was "voluntary" and he could "leave the same way [he] came in" because "[t]he door [was] not padlocked." Romanoff then verified defendant's pedigree information, including that he was thirty-two years of age. When asked about his address, defendant stated "[he did not] know the address where [he would be] staying" because he "just came here to Virginia" for "work."[5]

Romanoff asked defendant if he had any questions, to which defendant responded, "[w]ell, I don't know why I'm here." Romanoff replied, "you already know why you are here" because "someone has already talked to you about the same matter." Romanoff then advised defendant that they were there "to

[4] All quotes attributed to Romanoff are the interpreter's translation of Romanoff's words as reflected in the certified transcript of the interrogation. The parties stipulated to the accuracy of this transcript for purposes of the Miranda hearing.

[5] Defendant later explained that he had arrived in Virginia two days earlier to work for a man who had promised him work and housing but they were still working out the details.

 A-1917-22

investigate" allegations of an "[aggravated] sexual act" and specified that the allegations involved "sexual conduct with a minor."

Next, at Romanoff's request, Cerna administered <u>Miranda</u> warnings, advising defendant that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to speak with an attorney before and during any interrogation, that an attorney would be provided if he could not afford to hire an attorney, and that if he elected to answer questions without an attorney present, he still had the right to stop answering questions at any time to speak to an attorney. Defendant acknowledged understanding his rights, both verbally and in writing. Defendant also agreed to waive his rights and signed a waiver form to that effect, acknowledging that he consented to make a statement without an attorney present and that he was never promised anything or threatened in any way.

Turning to the substantive questioning, Romanoff began by explaining to defendant that he "work[s] in . . . many cases" and that "[s]ome are minor" and "some are very, very high." Romanoff continued: "[T]his case that [I am] going to talk about with you is a case, for [me,] it is minor[,] but for many people it could be something major, right? But [I have] seen cases that are worse than this one." Romanoff stressed that he knew "factual information" and was "not

going to lie to [defendant]." Romanoff explained "[t]he reason why [he was] talking to" defendant was to let him "explain . . . [his] side of [his] story." However, Romanoff cautioned defendant to tell the truth.

In response, defendant explained that the day of the alleged incident, he woke up early to get ready for work but saw that C.G.-M. had already left the house and left her two daughters at home with him. He called C.G.-M. on the phone and asked who would care for the girls when he left. C.G.-M. told him to leave them at the house when he went to work, which he did. Defendant explained that "several people" lived in the house in makeshift rooms separated by "sheets or curtains."

Later that afternoon, C.G.-M. called defendant and told him she had left the house with her daughters and taken his money from a dresser because he had touched her daughter. C.G.-M. threatened to "sink" defendant and told him she never wanted to see him again. Defendant denied the allegation, but she hung up and blocked his number. When defendant returned to the house about two hours later, C.G.-M. and the girls were gone. Defendant also discovered that in addition to taking all their things, they had taken his money. Frightened by the accusation and the possible consequences, defendant left New Jersey and came

12

to Virginia after talking to several people who advised him to leave the jurisdiction.

Romanoff asked defendant for his consent to search his phone, and defendant agreed. While Romanoff searched the phone,[6] defendant asked to use the restroom and was directed to the location by an officer. When Romanoff returned, he informed defendant that J.G. had told police that defendant had put his fingers in her vagina and that she had also undergone an examination at the hospital that had revealed a "cut inside her sexual area" and defendant's DNA "inside [her]." Romanoff admitted during cross-examination at the hearing that this was a lie, and that he, in fact, had no information indicating defendant's DNA was found inside J.G.

As the interview continued, defendant continuously denied the allegation, but Romanoff insisted that defendant's lying was "not going to help [him]." Romanoff pointed out that defendant had lied from the very beginning when he claimed he did not know why he was at the police station and professed he had come to Virginia for work, rather than flee the jurisdiction. Romanoff continued to make a distinction between being accused of having "sex with girls," where

---

[6] Romanoff later commented during the interview that defendant had "erased all the information on [his] cell phone."

"you're going to go to jail for a long time," and what defendant was accused of doing. Romanoff also drew a distinction between "[p]eople [who] are absolute animals" and "people [who] make mistakes," particularly a mistake fueled by "testosterone." Romanoff said he could "accept that [defendant] made . . . a mistake" but reiterated that defendant was "not taking any responsibility." Romanoff asserted that defendant's "only chance" was to "stop telling lies" and admit to what happened.

Cerna added:

> Believe me, it is better to go with the truth. I am trying to help you here. Sometimes they put us in these situations. I am here, they sent me here so that I could help you. I want you to help yourself a little, okay? Do it for you. They put me in this position to be here on this day and I stayed, because someone wanted me to help you, so that you could communicate with the officer. Help yourself a little bit.

As the interview continued, Cerna repeatedly interjected his own comments to defendant, reinforcing Romanoff's entreaties to defendant to tell the truth and appealing to defendant's belief in God.

After further probing by Romanoff, defendant persisted in his denials and offered other theories to explain the accusation, including his belief that J.G. had been previously molested by her own father. Ultimately, defendant admitted that on the night in question, he touched J.G.'s "buttocks" and "one side [of] her

14

intimate part" for "four seconds." Although he claimed that he "never stuck [his] fingers inside [her]," he later admitted that when he touched her, a finger may have gone inside. Defendant explained that J.G. was laying on the bed on her stomach fully clothed. He denied videotaping the contact or illuminating J.G.'s genitalia with his phone during the incident. He also denied being aroused by the contact and stated he felt "bad[ly]" afterwards. He explained that he acted on an "impulse."

After defendant made the admissions, Romanoff asked if he wanted to write J.G. an apology letter and offered to leave him a pen to do so. At that juncture, defendant asked, "[t]he note that's there said that I could not talk, for an attorney also," to which Romanoff responded, "[T]hat's true," without any further inquiry or clarification. Defendant wrote a one-page apology letter to J.G. that was admitted into evidence but was not provided in the record on appeal. After the interview, which lasted approximately two hours, defendant was placed under arrest and subsequently waived extradition.

Romanoff explained that the "whole interview" and his repeated entreaties to defendant to tell the truth were "appealing to his morals." Romanoff expounded that when he drew the distinction between "having actual sex" with a child and "just touching a young child," he "was making a reference to

15

morality" rather than a legal distinction. He added that when he told defendant, "it would be okay," he did not mean defendant was "not going to face consequences [for his] actions," and he never told defendant he was "not going to go to jail for this." Romanoff also confirmed that when defendant inquired about not having "to talk if [he] didn't have a lawyer," Romanoff never asked any follow-up questions to clarify whether defendant was asking for a lawyer.

Similarly, Cerna confirmed that when he repeatedly told defendant to "tell[] . . . the truth" and "help [him]self," he was appealing to defendant's emotions as a God-fearing man because defendant had indicated that he "believe[d] in God." Cerna explained that during his separate conversations with defendant, he was attempting to ensure that "defendant . . . really under[stood]" what Romanoff was asking him and trying to get Romanoff's "point[s]" across.

Both Romanoff and Cerna testified that during their interaction, defendant did not appear to be "under the influence" in any way. He was not disoriented, sleepy, or in any type of distress. Defendant also confirmed during the interview that he had not consumed any alcohol or drugs or taken any medications. Romanoff also verified with all the officers who had contact with defendant that defendant's decision to give a statement was "fully consensual."

16

Following the hearing, the judge issued an order denying defendant's motion to suppress his statement. In a comprehensive written opinion, the judge detailed the facts, articulated the applicable legal principles, and drew legal conclusions. On the issue of custody, the judge found that "defendant was not in custody." The judge explained that "[a] reasonable person in defendant's position would have felt free to leave."

In support, the judge expounded:

> This defendant was able to leave should he have so chosen. Defendant was advised numerous times that he was not under arrest. He was not handcuffed, and moved freely into the police cruiser, throughout the station, into the interview room, and back and forth to the restroom in the middle of the interview. Officers also advised defendant on numerous occasions that he was free to leave and they demonstrated that there were no locked doors between him and the outside of the station. Defendant transported himself from New Jersey to Virginia without any apparent trouble, and had a contact in Virginia that had allegedly offered defendant work and shelter. Therefore, defendant was not in custody[,] and officers were not required to advise defendant of his Miranda rights, as defendant advised that he was willing to speak with officers.

Alternatively, the judge found "beyond a reasonable doubt" that even if Miranda warnings were warranted, "defendant waived his [Miranda] rights voluntarily, knowingly, and intelligently." In that regard, the judge distinguished this case from State v. O.D.A.-C., 250 N.J. 408, 413 (2022), where

17

our Supreme Court invalidated the defendant's waiver of his rights and suppressed the defendant's custodial statement because the detective "repeatedly contradicted and minimized the significance of the Miranda warnings." Here, the judge found that the officers "said nothing about Miranda warnings being a formality and did not advise defendant that their conversation was confidential. Further, the officers did not say defendant's admissions would not hurt him."

Although the judge did not expressly address the voluntariness of defendant's statement, in ruling that the statement was admissible at trial, the judge found that "[t]he officers merely appealed to defendant's sense of morality, religion, and emotions by advising that telling the truth would help him personally live with his alleged acts." The judge expounded:

> Considering the totality of the circumstances in this case[,] this court finds the following: defendant was [thirty-two] years old at the time of his arrest; defendant was born outside of the United States and speaks only Spanish; defendant's education level is unknown; defendant was a new arrival to the Commonwealth of Virginia at the time of the arrest but had a contact that was allegedly going to provide him a residence; and defendant did not appear to be under the influence of any mind[-]altering substance during the interview, [as] he spoke coherently and answered questions directly. Officers told defendant that admitting to his crimes would be the right thing to do; they did not lie to defendant about the punishment he could receive if he committed the alleged abuse and did not downplay the importance of his Miranda rights.

The judge made no findings regarding whether defendant invoked his right to counsel during the interview. This appeal followed.

## II.

Our review of a trial court's granting or denying a suppression motion "is limited to confirming whether there is sufficient credible record evidence to support the trial court's findings of fact." State v. Erazo, 254 N.J. 277, 297 (2023). Therefore, ordinarily, an appellate court "must not disturb the factual findings made by the trial court even if it might have reached a different conclusion." Ibid. "'[A] trial court's findings should be disturbed only if they are so clearly mistaken "that the interests of justice demand intervention and correction."'" State v. A.M., 237 N.J. 384, 395-96 (2019) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). Deference to a trial court's factual findings is appropriate "because the trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting Elders, 192 N.J. at 244). "That standard governs appellate review even when the trial court's findings are premised on a recording or documentary evidence that the appellate court may also review." State v. Tillery, 238 N.J. 293, 314 (2019) (citing S.S., 229 N.J. at 380-81).

A-1917-22

However, "[t]o the extent that a trial court determination involved legal conclusions, we review those conclusions de novo." Ibid.; see State v. Handy, 206 N.J. 39, 45 (2011) (noting that whether established facts warrant suppression is a "purely . . . legal question" subject to plenary review); see also O.D.A.-C., 250 N.J. at 425 (noting that the determination of the validity of a waiver "is a legal, not a factual, question"); Miller v. Fenton, 474 U.S. 104, 110 (1985) (noting the ultimate issue of the voluntariness of a confession is a legal question); State v. Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003) (same).

Turning to the governing principles of constitutional law pertinent to this appeal, "[t]he right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381-82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). In Miranda, the United States Supreme Court "determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically triggering the Fifth Amendment privilege against self-incrimination." State v. P.Z., 152 N.J. 86, 101-02 (1997) (citing Miranda, 384 U.S. at 436).

As a result, when people

> in police custody [are] questioned by law enforcement, [they] must be told that [they have] the right to remain

silent, that any statement [they] make[] may be used against [them], that [they have] the right to an attorney, and that if [they] cannot afford an attorney, one will be provided for [them].

[Id. at 102 (citing Miranda, 384 U.S. at 444).]

"Miranda imposes a fifth requirement: that a person must be told that he [or she] can exercise [these] rights at any time during the interrogation." Tillery, 238 N.J. at 315 (internal quotation marks omitted) (citing Miranda, 384 U.S. at 479). These procedural safeguards, commonly referred to as "Miranda warnings," P.Z., 152 N.J. at 102, are intended "to secure the privilege against self-incrimination" and are required whenever custodial interrogation occurs. Miranda, 384 U.S. at 444.

Custodial interrogation "mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." Ibid. "Thus, the protections provided by Miranda are only invoked when a person is both in custody and subjected to police interrogation." State v. Hubbard, 222 N.J. 249, 266 (2015). While federal law requires a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted), "[o]ur courts have also recognized that custody in the Miranda sense does not necessitate a formal

21

arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station." P.Z., 152 N.J. at 102-03 (internal quotation marks omitted).

Still, "simply because someone is questioned at a police station[] by police officers[] does not mean they are 'in custody.'" Erazo, 254 N.J. at 299. "Nor is it dispositive whether police consider someone a 'suspect,' 'person of interest,' or 'witness.'" Ibid.; see, e.g., State v. Keating, 277 N.J. Super. 141, 148 (App. Div. 1994) ("What the police had in mind . . . is not the issue; the issue is whether defendant reasonably believed that he was in custody when being questioned.").

Thus, "[w]hether a suspect has been placed in custody is fact-sensitive and sometimes not easily discernable." State v. Scott, 171 N.J. 343, 364 (2002). "The relevant inquiry is determined objectively, based on 'how a reasonable [person] in the suspect's position would have understood his [or her] situation,'" rather than "'on the subjective views harbored by either the interrogating officers or the person being questioned.'" Hubbard, 222 N.J. at 267 (first alteration in original) (first quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984); and then quoting Stansbury v. California, 511 U.S. 318, 323 (1994)).

Indeed, "[t]he critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." P.Z., 152 N.J. at 103; see State v. Smith, 374 N.J. Super. 425, 431 (App. Div. 2005) (delineating relevant factors in evaluating custody as "the time, place and duration of the detention; the physical surroundings; the nature and degree of the pressure applied to detain the individual; language used by the officer; and objective indications that the person questioned is a suspect").

Once the defendant is subjected to custodial interrogation requiring the administration of Miranda rights, "[t]he defendant may waive effectuation of [those] rights, provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. Under New Jersey law, "the State must 'prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances.'" Tillery, 238 N.J. at 316 (quoting State v. Presha, 163 N.J. 304, 313 (2000)).

"To determine the question of waiver, the trial court reviews 'the totality of the circumstances surrounding the custodial interrogation.'" Ibid. (quoting A.M., 237 N.J. at 398).

Under the totality-of-the-circumstances test, courts commonly consider a number of factors to determine if a Miranda waiver is valid. They include the suspect's "education and intelligence, age, familiarity with the criminal justice system, physical and mental condition, . . . drug and alcohol problems," how explicit the waiver was, and the amount of time between the reading of the rights and any admissions. 49 Geo. L.J. Ann. Rev. Crim. Proc. 233-36 (2020); Tillery, 238 N.J. at 317.

[O.D.A.-C., 250 N.J. at 421 (omission in original).]

In soliciting a waiver, the interrogating officer must conduct a complete inquiry "to address the question of waiver in the Miranda inquiry." Tillery, 238 N.J. at 318. To that end, the interrogating officer should "ask whether the suspect understands his or her rights, and whether, understanding those rights, he or she is willing to answer questions." Ibid. "The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances." State v. Kremens, 52 N.J. 303, 311 (1968).

Importantly, law enforcement officers should scrupulously avoid making comments that minimize the significance of the administration of the Miranda warnings. "Courts have long recognized that '[a] police officer cannot directly contradict, out of one side of his [or her] mouth, the Miranda warnings just given out of the other.'" O.D.A.-C., 250 N.J. at 421 (first alteration in original) (quoting State v. L.H., 239 N.J. 22, 44 (2019)).

24

Referring to <u>Miranda</u> warnings as . . . "formalit[ies]," for example, downplays their significance. <u>Doody v. Ryan</u>, 649 F.3d 986, 1002-03 (9th Cir. 2011) (en banc). The label suggests that <u>Miranda</u> warnings are little more than a box on a bureaucratic checklist waiting to be checked off—and that is simply wrong. <u>Miranda</u> warnings are a constitutional requirement meant to protect a person's rights under the Fifth Amendment; they are not a formality. To describe them in that way minimizes their import and undermines "the very purpose of <u>Miranda</u>." <u>Ross v. State</u>, 45 So. 3d 403, 428-30 (Fla. 2010) (criticizing a reference to the warnings as "just a matter of procedure").

. . . .

. . . [T]elling suspects that confessing "could not hurt" and "could only help" them also contradicts <u>Miranda</u>. <u>State v. Puryear</u>, 441 N.J. Super. 280, 298 (App. Div. 2015); <u>see also</u> <u>State in the Int. of A.S.</u>, 203 N.J. 131, 140, 152 (2010) (suppressing a statement in which a detective told a juvenile "[t]he truth is only going to help you," among other things). All defendants run the risk that their words will be used directly against them at trial to secure a conviction.

[<u>O.D.A.-C.</u>, 250 N.J. at 422-23 (last alteration in original) (citation reformatted).]

Still, suppression is not required "any time an officer makes an improper comment during an interrogation." <u>Id.</u> at 423. "Such an approach would lead to the suppression of voluntary statements in a number of instances. In contrast, the totality-of-the-circumstances test can both root out improper police

statements that result in an invalid waiver and recognize knowing and voluntary waivers." Ibid.

"Beyond the issue of waiver, there are separate due process concerns related to the voluntariness of a confession. Due process requires the State to 'prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne.'" Id. at 421 (quoting L.H., 239 N.J. at 42). In that analysis, "[t]he totality-of-the-circumstances test applies . . . as well," ibid., and "[t]here is substantial overlap between the factors that govern a court's determination of whether a Miranda waiver is valid and the factors that a court considers in its separate assessment of the voluntariness of a confession." Tillery, 238 N.J. at 316-17. That said, "'[t]he due process test takes into consideration "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."'" L.H., 239 N.J. at 42 (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)).

Applying these principles, we agree with the judge that defendant was not in custody when he was interviewed by the officers. Because he was not in custody, Miranda warnings were not required. Defendant argues he was in custody "where police located him using a [CDW], approached him late in the

evening, brought him to a private interview room in a police station, and then interrogated him for two hours about allegations he had committed a sexual assault." Defendant distinguishes his case from Erazo, where our Supreme Court upheld a trial court's determination that an initial interview at a police station was not custodial and did not implicate Miranda. 254 N.J. at 300.

In Erazo, police were investigating the disappearance of an eleven-year-old girl who had been seen earlier in the day playing near the defendant's apartment. Id. at 284. Although an earlier search of the defendant's apartment revealed nothing of evidentiary value, police returned several hours later after discovering the child's "partially naked body on the roof of a shed behind the apartment building, below a window of [the] defendant's apartment," and "asked [the] defendant to ride with them" to the police station "about three tenths of a mile from [the] defendant's home" to "provide a witness statement." Id. at 284-85.

"When [the] defendant arrived at the station, he sat unrestrained along with others—including the victim's family—in a makeshift lobby separated from the rest of the station by a barrier. To go beyond the barrier, civilians needed to be escorted by an officer or employee." Id. at 285. Detectives "met [the] defendant in the lobby," "explained that they wanted to talk to him," and

"escorted [the] defendant to the only available interview room, which was located on the second floor" and "was not equipped with audio or video recording equipment." Ibid. The "[d]efendant stated that he knew there was a missing persons investigation and agreed to provide any information he had that could help." Ibid. "The detectives testified that they believed they were taking a witness statement and thus did not administer Miranda warnings or record the interview." Ibid.

Over the next ninety minutes, the defendant provided general biographical information as well as "a timeline of his whereabouts and activities for that day." Id. at 285-86. He admitted seeing the victim "in front of the apartment building" but denied any further interaction with her. Ibid. The defendant was offered food, water, and a bathroom break and allowed to smoke a cigarette. Id. at 286. He was also left alone, "unrestrained," in the unlocked interview room. Ibid. Once the detectives learned that a witness had seen someone matching the victim's description enter the defendant's apartment with someone matching the defendant's description on the day of the disappearance, the detectives then considered the defendant a suspect and moved him to the first-floor interview room, equipped with audio and video recording capabilities, to interrogate him. Ibid. The defendant was again given a bathroom break and allowed to smoke a

A-1917-22

cigarette. Ibid. The interrogation began about five hours after the defendant's interview on the second floor ended. Id. at 287. Before interrogating the defendant, he was administered Miranda warnings, waived his rights, and ultimately confessed to the murder. Id. at 287-90.

In concluding that the first interview was not custodial, the Court reasoned:

> There is no evidence that [the] defendant was forced to go to the police station or that he was handcuffed during the drive. Indeed, there is no reason to believe that the short trip was anything but voluntary. Moreover, when [the] defendant arrived at the station, he sat on a bench—unsupervised and unrestrained—among other members of the public, including his neighbors from the apartment complex and members of [the victim's] family. In no way was [the] defendant's freedom of action restrained to a "degree associated with" formal arrest. See Beheler, 463 U.S. at 1125.

> [Erazo, 254 N.J. at 300.]

Similarly, here, nothing about the interview suggests that it was custodial. The record amply supports the judge's factual findings that defendant rode voluntarily and unrestrained with Cerna to the nearby police station; upon arrival at the police station, defendant was left in a public lobby, unsupervised; defendant was never restrained and was repeatedly told he was free to leave at any time; defendant was escorted to an unlocked private room, equipped with

29

recording capabilities; and the officers offered defendant refreshments and allowed him to go to the bathroom. Additionally, although defendant was being questioned about allegations that he had sexually assaulted a minor, Romanoff and Cerna both testified that there was no warrant for defendant's arrest, and whether police consider someone a suspect or a witness is not dispositive. See id. at 299. Therefore, we are satisfied there is no basis to upset the judge's conclusion that the interview was noncustodial. "Because defendant was not in custody, he was not owed Miranda warnings . . . ." Id. at 300.

Based on our decision, we need not address whether Miranda warnings were properly administered or whether defendant's waiver was valid. However, we must determine whether the State proved beyond a reasonable doubt that defendant's confession was voluntary and not made because defendant's will was overborne. In that analysis, the totality-of-the-circumstances test applies and we consider the same factors that "govern a court's determination of whether a Miranda waiver is valid." Tillery, 238 N.J. at 316-17.[7]

---

[7] Although the judge did not expressly address the voluntariness of defendant's statement, she did consider the same totality-of-the-circumstances factors in connection with her assessment of the validity of defendant's waiver of his Miranda rights.

In that regard, defendant argues that in addition to undermining and contradicting the <u>Miranda</u> warnings by "urging [defendant] fifteen times to 'help [him]self' by admitting to the conduct" and telling defendant they had "proof against him," "the officers' actions throughout the interrogation overbore [defendant's] will by misrepresenting his rights, minimizing the gravity of the offenses at issue and their legal consequences, and making insistent and false representations about DNA evidence against [defendant]." In essence, defendant urges that the psychological pressures to which he was subjected by the officers during the interview overbore his will, leading to an involuntary confession.

To be sure, "[t]he voluntariness determination weighs the coercive psychological pressures brought to bear on an individual to speak against his [or her] power to resist confessing." <u>L.H.</u>, 239 N.J. at 43. That said,

> [b]ecause a suspect will have a "natural reluctance" to furnish details implicating himself [or herself] in a crime, an interrogating officer may attempt "to dissipate this reluctance and persuade the [suspect] to talk." <u>State v. Miller</u>, 76 N.J. 392, 403 (1978). One permissible way is by "[a]ppealing to [the suspect's] sense of decency and urging [the suspect] to tell the truth for his [or her] own sake." <u>Id.</u> at 405. Our jurisprudence even gives officers leeway to tell some lies during an interrogation. <u>See</u> <u>State v. Galloway</u>, 133 N.J. 631, 655 (1993); <u>Miller</u>, 76 N.J. at 403-04.

31

[L.H., 239 N.J. at 43-44 (third, fourth, and fifth alterations in original) (citations reformatted).]

However, our Supreme Court cautioned that "[c]ertain lies . . . may have the capacity to overbear a suspect's will and to render a confession involuntary." Id. at 44. Such lies include a police officer "directly or by implication" telling suspects that their statements "will not be used against [them] because to do so is in clear contravention of the Miranda warnings." Ibid.

> Other impermissible lies are false promises of leniency that, under the totality of circumstances, have the capacity to overbear a suspect's will. See [State v. Hreha, 217 N.J. 368, 383 (2014)]. A "free and voluntary" confession is not one extracted by "threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Brady v. United States, 397 U.S. 742, 753 (1970) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).

> "A court may conclude that a defendant's confession was involuntary if interrogating officers extended a promise so enticing as to induce that confession." Hreha, 217 N.J. at 383 (citing State v. Fletcher, 380 N.J. Super. 80, 89 (App. Div. 2005)). "[W]here a promise is likely to 'strip[] [a] defendant of [the] "capacity for self-determination"' and actually induce the incriminating statement, it is not voluntary." Fletcher, 380 N.J. Super. at 89 (quoting Pillar, 359 N.J. Super. at 272-73).

> . . . Some courts also take into account an interrogator's "minimization" of the offense when

questioning the suspect as one factor in determining the voluntariness of a confession.

[L.H., 239 N.J. at 44-46 (second and third alterations in original).]

Here, based on the undisputed evidence in the record, we are satisfied that the State proved beyond a reasonable doubt that defendant's confession was voluntary under the totality-of-the-circumstances test. In administering the Miranda warnings, the officers did not make the types of comments the Court deemed problematic in O.D.A.-C. Neither did the officers make false promises nor minimize the offense in a manner prohibited in L.H. Instead, the officers appealed to defendant's sense of decency and morality, made a distinction between major and minor sex offenses, acknowledged that defendant was not an "animal" but had made a "mistake," and implored him to help himself by taking responsibility and telling the truth.

Critically, the officers never expressly nor implicitly stated that defendant would not go to jail for the crime he allegedly committed. See Miller, 76 N.J. at 403-04 (condoning an interrogating officer investigating a brutal murder for which the defendant was a suspect telling the defendant that whoever killed the victim was not a criminal who should be punished, but a person who needed

33

medical treatment, and informing the defendant that he must help himself first by telling the truth and then the officer would do what he could to help him).

Although Romanoff admittedly lied to defendant regarding his DNA being found inside J.G., we are satisfied that the misrepresentation did not overbear defendant's will. "[L]aw enforcement officers may employ deception or trickery in an interrogation of a suspect unless such deception or trickery was calculated to produce an untruthful confession or was offensive to due process." State v. Baylor, 423 N.J. Super. 578, 588-89 (App. Div. 2011) (citing State v. Manning, 165 N.J. Super. 19, 30-31 (App. Div. 1978)). "Although police misrepresentations are relevant in analyzing the totality of the circumstances surrounding a claim that a confession was involuntary, such 'misrepresentations alone are usually insufficient to justify a determination of involuntariness or lack of knowledge.'" Pillar, 359 N.J. Super. at 269 (quoting State v. Cooper, 151 N.J. 326, 355 (1997)). Additionally, "a misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession." Ibid. (quoting Cooper, 151 N.J. at 355).

"In determining whether the State satisfied its burden of proving beyond a reasonable doubt the voluntariness of defendant's confession, we do not look at any one factor in isolation . . . . Rather we view all as part of a larger tableau

34

that constitutes the totality of the circumstances." L.H., 239 N.J. at 49. Viewed through this lens, although the officers engaged in some deception, it did not result in defendant making a statement he would not have otherwise made voluntarily. We therefore conclude that defendant's admission "was voluntarily secured beyond a reasonable doubt by means consistent with our constitutional jurisprudence." Ibid.

We next address defendant's argument regarding his invocation of his right to counsel. Defendant asserts that when he "pointed to the Miranda waiver form, stating '[t]he note that's there said that I could not talk, for an attorney also,'" this remark "was at least an ambiguous invocation of counsel that, under our State's law, triggered a duty for the interviewing officer 'to cease questioning and clarify whether defendant was requesting counsel during the interview.'" (citing State v. Gonzalez, 249 N.J. 612, 620 (2022)). We agree.

"When a suspect makes a statement that arguably amounts to an assertion of Miranda rights and the interrogating agent recognizes that the statement is susceptible to that construction, questioning should cease and the police should inquire of the suspect about the correct interpretation of the statement." State v. Chew, 150 N.J. 30, 63 (1997). "Because the right to counsel is so fundamental, an equivocal request for an attorney is to be interpreted in a light most favorable

35

to the defendant." Ibid. "Accordingly, we rejected the federal standard enunciated by the U.S. Supreme Court in [Davis v. United States, 512 U.S. 452, 459 (1994)] and found 'it prudent to continue to apply our precedent' requiring that interrogators conduct an appropriate inquiry into a suspect's ambiguous invocation of the right to counsel." Gonzalez, 249 N.J. at 629 (quoting Chew, 150 N.J. at 63).

Thus, under New Jersey's more flexible approach, "if a suspect 'states that he [or she] wants an attorney, the interrogation must cease until an attorney is present,' even if the request for counsel is 'ambiguous' or 'equivocal.'" State v. Wade, 252 N.J. 209, 219 (2022) (first quoting Gonzalez, 249 N.J. at 628; and then quoting State v. Clark, 251 N.J. 266, 292 (2022)). "[A] suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel." State v. Reed, 133 N.J. 237, 253 (1993).

"[W]here the suspect's 'statements are so ambiguous that they cannot be understood to be the assertion of a right, clarification is not only permitted but needed.'" Gonzalez, 249 N.J. at 630 (quoting State v. Alston, 204 N.J. 614, 624 (2011)). "In situations where clarification is required, substantive questioning should resume only after 'the suspect makes clear that he [or she] is not invoking

his [or her] <u>Miranda</u> rights.'" <u>Ibid.</u> (quoting <u>State v. Johnson</u>, 120 N.J. 263, 283 (1990)). "When officers do not honor such a request, the suspect's statements are 'presumed involuntary' and thus inadmissible at trial, any purported waiver notwithstanding." <u>Wade</u>, 252 N.J. at 219 (quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 177 (1991)).

Here, given the language barrier, we interpret defendant's remark as an equivocal invocation of his right to counsel. Because it is undisputed that Romanoff made no further inquiry to clarify whether defendant was requesting counsel, but instead agreed with defendant and continued to coax him to write an apology letter, all portions of defendant's statement made thereafter as well as defendant's apology letter are inadmissible at trial.

We therefore affirm the judge's ruling that defendant was not in custody and thus not yet owed <u>Miranda</u> warnings when he provided a statement to police. Based on our de novo review, we also conclude that defendant's ensuing statement was voluntary and admissible at trial up until the point where he made an equivocal invocation of his right to counsel. Thereafter, all portions of defendant's statement, including defendant's apology letter, are inadmissible at trial. As a result, we affirm in part, reverse in part, and remand to the trial court

for defendant to be afforded the opportunity to withdraw his guilty plea.  See R.
3:9-3(f).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hadley

Clerk of the Appellate Division

A-1917-22